**The VULCAN SOCIETY OF the NEW YORK CITY FIRE DEPARTMENT, INC., et al., Plaintiffs,**

v.

**CIVIL SERVICE COMMISSION OF the CITY OF NEW YORK et al., Defendants.**

**No. 73 Civ. 201.**

United States District Court, S. D. New York.

Jan. 22, 1973.

Nickerson, Kramer, Lowenstein, Nessen & Kamin, New York City, for plaintiffs; Maurice N. Nessen, Thomas H. Moreland, New York City, of counsel.

Norman Redlich, Corporation Counsel, New York City, for defendants; Leonard Bernikow, Paula Omansky, New York City, of counsel.

## OPINION

WEINFELD, District Judge.

This is a class action brought on behalf of all blacks and Hispanics [1] who allege they have been excluded from jobs as firemen or have been deterred from obtaining promotions in the New York City Fire Department as a result of Civil Service examinations, job criteria and procedures promulgated by the Civil Service Commission and other agencies of the City of New York. Encompassed within those claims is the validity of a Civil Service list based upon a 1971 written entrance examination (hereafter Exam 0159). The charge is that Exam 0159 is discriminatory and violated the rights of plaintiffs and their class to equal protection and due process of law because it (1) did not fairly test the skills and qualifications necessary to be a fireman, and (2) discriminated in effect against black and Hispanic firemen applicants due to the low relative scores they achieved on it.

---

1. Plaintiffs state "[t]he term Hispanics includes all persons who come from homes in which Spanish was spoken and who were born or who are descendants of people born in Puerto Rico or any other Latin American or Caribbean country or territory."

The plaintiffs include five black and Hispanic applicants who took Exam 0159, but whose scores they assert will prevent them from becoming firemen if the defendants use the results of the examination as the sole basis of appointment. The other plaintiffs are two membership societies comprised of minority firemen and officers in the New York City Fire Department, many of whom allege they have been effectively barred from promotion because of the discriminatory impact of the defendants' promotional examinations.

Exam 0159, under immediate challenge, was taken by some 14,150 applicants in September 1971; 12,050 passed it. Although the alleged discriminatory nature of that examination and related practices have been known for some time, no action was taken with respect thereto by any applicant or group until plaintiffs commenced this suit on January 12, 1973. The City authorities took no action to effectuate the list based upon the examination until a week ago when, to meet a critical shortage of manpower in the firefighting forces, it was decided to appoint 120 men—thirty-five from the last list, based upon a 1968 examination, which has since expired,[2] and eighty-five from the 1971 list. A job freeze had been in effect from March 1971, which continued until October 31, 1972.

The plaintiffs move for a preliminary injunction to enjoin the defendants from establishing a ranked list for the appointment of firemen[3] or making any appointments based on the results of Exam 0159 and from using the scores achieved by applicants on that examination. Specifically, they now seek to enjoin the appointment of the eighty-five persons from the list ordered to report for duty on January 27, 1973, when together with the thirty-five previously appointed they commence an eight-week training course at a school organized for that purpose. In addition, plaintiffs seek to enjoin the

contemplated appointment of some 628 others, beginning in March 1973 and extending over an eighteen-month period. The plaintiffs contend that the appointments from the list will result in irreparable injury to them and the class they purport to represent, entitling them to immediate relief. They urge that in the event they prevail on the merits, any appointments previously made from the list would aggravate the alleged under-representation of minorities in the New York City Fire Department and would limit the court's ability to devise a remedy that will cure the discriminatory impact of the 1971 examination. Contrariwise, the defendants assert that the City is in such dire need of the services of additional firemen that if appointments are not made as scheduled, irreparable injury will be visited upon the community, which will be deprived of the augmented services essential to the protection of life and property. The Fire Commissioner submitted an affidavit in which he asserts that as a result of the extended job freeze a critical shortage of manpower exists; that the effective roster strength of the firefighting force of the City is below the authorized allowance necessary to provide the protection and services as mandated by the City Charter and the shortage is aggravated by the average attrition rate of firemen. He further avers that to overcome this critical situation, which threatens to impair seriously the efficient operation of the Department, a schedule of appointments has been set up, starting with the 120 men who are to report on January 27, 1973. The proposed schedule, in addition to the 120 men, contemplates the appointment of 628 men from the 1971 list, starting with 100 on March 24, 1973, and additional appointments thereafter at periodic intervals until April 1974.

Realistically, each side has contributed to the last minute pressure situation which now confronts the court; each side failed to take action from September

---

2. Plaintiffs sought a temporary restraining order to enjoin the appointment of the 35 men, but this was denied by Judge Bonsal.

3. Since the list was established on January 18, 1973, plaintiffs also request an order declaring it void.

1971 to the present; each may be charged with laches. The consequence is that caught in the middle of this controversy are the inhabitants of this city who are entitled to the maximum services essential to their well being.

Plaintiffs have presented little specific data as to the 1971 examination. However, they point to the last examination (1968), which list has just expired, and stress that only thirty-five per cent of minority applicants passed as against a rate of eighty-one per cent for non-minority applicants; further, that most of the minority applicants who passed the 1968 examination did so with scores so low that they were ranked in the bottom half of the eligible list with no practical chance of appointment. As to the 1971 examination, plaintiffs, without sufficient substantiation at this point, but based principally on the previous experience, contend that the failure rate of minority applicants was more than twice as great as that of non-minority applicants and accordingly that they have established prima facie de facto racial discrimination under the authority of Chance v. Board of Examiners.[4]

The defendants sharply challenge plaintiffs' contention that discrimination has been established. Further, they contend that even if, as plaintiffs allege, they have established a prima facie case of de facto discrimination, nonetheless the examination was job related. Moreover, the City alleges that no definitive determination of alleged discrimination can be made without a survey patterned along that conducted in *Chance*,[5] upon which plaintiffs rely so heavily.

Whatever the merits of the disputed positions on this motion, the interests of the citizens of the community cannot be disregarded. As this court has stated the rule on another occasion:

"It is familiar teaching that a preliminary injunction should be granted only upon a clear showing by the party seeking the extraordinary remedy (1) of probable success upon a trial on the merits; (2) of likely irreparable damage to him unless the injunction is granted; and (3) that the harm to him outweighs the injury to others if it is denied."[6]

In view of the delay in action attributable to both sides, there is no reason, absent a clear showing of irreparable injury and a right to immediate relief, for depriving the public at this preliminary juncture of the case of such protection as may be afforded by the appointment of eighty-five men from the list.[7] The harm to the public outweighs the claimed injury asserted by plaintiffs. Additionally, the delay in bringing action has its impact upon the eighty-five men. They are required to report on January 27 for an eight-week course at a training school before they are equipped to undertake their duties. If their training is interrupted, it will necessarily delay their appointment and that of the thirty-five men from the 1968 list, since the classes are set up to take a certain number of trainees at one time. Moreover, the contention is made as to the eighty-five men that an injunction will visit hardship upon them since many have already either quit their jobs, having received notice to report to the training school, or given their employers notice of their intention to do so in the full expectation that their eight-week training course would proceed normally. Accordingly, the branch of the motion for a preliminary injunction as to the eighty-five men is denied. The denial, however, is without prejudice to further consideration of plaintiffs' application as to those scheduled for future appointment, which is set for a continued hearing commencing on January 29, when the factual situation may be more thoroughly explored and presented by the parties. Obviously the denial of the requested stay as to the eighty-five men reflects no determination of the basic issue as to the validity of the 1971 examination.

4. 458 F.2d 1167 (2d Cir. 1972).

5. *Id.* at 1170, et seq.

6. Goldberg v. First Devonshire Corp., 320 F.Supp. 780, 782 (S.D.N.Y.1970).

7. McConnell v. Lucht, 320 F.Supp. 1162, 1166 (S.D.N.Y.1970).