The **VULCAN SOCIETY OF the NEW
YORK CITY FIRE DEPARTMENT,
INC., et al., Plaintiffs,**

v.

**CIVIL SERVICE COMMISSION OF the
CITY OF NEW YORK et al.,
Defendants.**

No. 73 Civ. 201.

United States District Court,
S. D. New York.

June 12, 1973.

**1266**

Nickerson, Kramer, Lowenstein, Nessen & Kamin, New York City, for plaintiffs; Maurice N. Nessen, Thomas H. Moreland, Elizabeth .B. DuBois, New York City, of counsel.

Norman Redlich, Corp. Counsel, New York City, for defendants; Paula Omansky, Frances Loren, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is a civil rights action brought under 42 U.S.C., sections 1981 and 1983, and their jurisdictional counterparts, 28 U.S.C., sections 1331, 1343(3) and 1343(4), challenging the validity of the hiring and promotion procedures of the New York City Fire Department (hereafter the "Department") on the ground that they discriminate against blacks and Hispanics in violation of the equal protection clause of the Fourteenth Amendment. Essentially the claim is that the challenged procedures do not fairly test the skills and qualifications needed to become a fireman or, after appointment, to perform the duties of higher positions. The issues presented for the Court's determination at this time concern only the entrance procedures.

The action was commenced as a class suit by five black and Hispanic plaintiffs who took the most recent civil service examination for firemen (hereafter "Exam 0159") but either failed to pass or whose rankings upon passing make it unlikely that they will be appointed. Plaintiffs also include the Vulcan and Hispanic Societies, whose memberships comprise most of the black and Hispanic firemen and officers of the Department, many of whom it is alleged have been effectively barred from promotion because of the discriminatory nature of the promotional examinations.[1] The de-

---

1. Plaintiffs seek to represent a class consisting of all blacks and Hispanics who, as a result of defendants' alleged course of conduct, (a) have been deterred, dis-

qualified or otherwise prevented from seeking or obtaining appointment as a fireman in the Department, or (b) have been deterred, disqualified or otherwise

fendants are the Commissioner of the Department, as well as the administrative agencies of New York City and those individuals responsible for promulgating and preparing the challenged entrance and promotional procedures.

Upon the filing of the action plaintiffs moved for a preliminary injunction particularly directed towards enjoining the appointment of eighty-five men based upon the results of Exam 0159 who were ordered to report for duty on January 27, 1973, to commence an eight-week training course. Plaintiffs also sought to enjoin the contemplated appointment of some 628 others from this list beginning in March 1973 and extending over a thirteen-month period.[2] The motion was denied as to the eighty-five men in view of the critical shortage of manpower that existed in the Department and the delay by plaintiffs in making their application. In sum, the Court concluded, particularly in view of the sharply contested fact issues, that the harm to the public outweighed the irreparable injury alleged by the plaintiffs; however, the denial was without prejudice to further consideration of plaintiffs' application for a preliminary injunction as to those scheduled for future appointment.[3] The hearing on the continued application for preliminary injunctive relief took seven days, during which extensive testimony was offered by both sides, with a transcript running more than 1,000 pages, and many exhibits were received in evidence. With the issues so thoroughly probed, the Court, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, ordered the trial of the action on the merits to be advanced and consolidated with the hearing on the motion for preliminary injunctive relief.

## THE EXAMINATION PROCEDURE

■ An applicant for the position of fireman must first take a written entrance examination, which is given approximately every four years. Those who fail to score 70% on this examination are eliminated from further consideration, and those who achieve 70% or better are ranked in the order of their scores. The resulting "eligible list" remains in effect and is the exclusive source of appointments until the next entrance examination is administered and a new eligible list established. As openings occur in the Department, they are filled by candidates in the order of their ranking on the current eligible list, provided that they also pass a second stage qualifying process which consists of (a) a test of physical strength and endurance, (b) a medical examination and (c) a character evaluation. These components are administered on a pass-fail basis. In addition, there are three grounds for automatic disqualification from appointment which are relevant to this action: (a) lack of a high school or equivalency diploma, (b) a height of less than 5′ 6″ and (c) any conviction for petty larceny or a felony. Plaintiffs challenge the constitutionality of the written examination, the character review and the grounds for automatic disqualification. They also attack the ab-

---

prevented from seeking or obtaining promotions within the Department. Since this Court is of the view that any equitable relief which may be appropriate should take the form of an injunction prohibiting further use of those procedures determined to be unconstitutional, which would automatically benefit all individuals similarly situated, there is no need to designate a class. *See* Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Serv. Comm'n, 354 F.Supp. 778, 783 (D.Conn. 1973); *cf.* Bailey v. Patterson, 323 F.2d 201, 206–207 (5th Cir. 1963); 3B J. Moore, Federal Practice ¶ 23.10–1, at 2768 (2d ed. 1969).

2. Following the taking of testimony and pending receipt of briefs and argument and consideration by the Court of the issues, 188 on the list were ordered to report for an eight-week training course. Defendants intend to appoint an additional 440 men from the list through April 27, 1974.

3. Vulcan Soc'y v. Civil Serv. Comm'n, 353 F.Supp. 1092 (S.D.N.Y.1973).

sence of a requirement restricting appointment to those applicants residing in New York City.[4]

At the trial, plaintiffs' proof was directed principally toward the written examination (0159) which was administered on September 18, 1971. Defendants established an eligible list on January 18, 1973,[5] which ranked the approximately 85% of the candidates who passed Exam 0159 in the order of their scores. The written examination, designed to determine which applicants had the capacity to learn and perform the duties of a fireman, consisted of five sections, each containing twenty multiple choice questions. Sections were devoted to vocabulary; reading comprehension; mechanical, scientific and mathematical knowledge; job situation questions (which appear to test familiarity with various aspects of firefighting); and New York City government and current events. Plaintiffs contend that Exam 0159 not only had a discriminatory impact upon racial minorities, but failed to meet professionally acceptable standards. In particular, they challenge (1) the inclusion of the twenty questions on city government and current events, and (2) the use of a selection procedure which fails to accord competitive weight to the physical examination and bases the order of appointment solely upon the scores achieved on the competitive written examination. They argue that the physical aspects of the fireman's job are of such significance that they merit competitive rating and that the failure to do so adds to the discriminatory impact of the competitive written examination.

## THE PRIMA FACIE CASE

The initial question is whether plaintiffs have established that Exam 0159 had a sufficiently discriminatory impact on minority applicants to impose upon the defendants the burden of establishing the examination is justified notwithstanding its discriminatory impact.[6] Did the examination disadvantage minorities to a "significant and substantial" degree?[7]

A total of 14,168 applicants took Exam 0159, of whom 12,049, or approximately 85%, passed with scores of 70 or above. According to a "head count" conducted by members of the Vulcan Society, 1,646, or 11.5%, of those who entered the examination halls were black or Hispanic. The Department, in due course, notified the highest ranking 7,987 candidates who had passed the written examination to report for their physical and medical examinations, and of these a total of 4,462 appeared for and passed the second stage of the selection process.[8] With respect to these 4,462, the Department conducted its own ethnicity survey, which reflected that 249, or 5.6%, were minorities. David Siegmund, a professor of mathematical statistics at Columbia University, was called by plaintiffs to determine, on the basis of the Vulcan Society's head count and the Department's sight survey, the relative impact of Exam 0159 on whites and minorities. Taking the first 4,000

---

4. The complaint includes additional allegations that defendants' efforts to recruit minority applicants are constitutionally inadequate, but since all the named plaintiffs took the entrance examination they do not have standing to contend that they were aggrieved by lack of notice of the examination. Castro v. Beecher, 334 F.Supp. 930, 937 (D.Mass. 1971), aff'd in relevant part, 459 F.2d 725 (1st Cir. 1972).

5. A job freeze was in effect from March 1971 until October 31, 1972.

6. Chance v. Board of Examiners, 458 F.2d 1167, 1175–1177 (2d Cir. 1972); see also, e. g., Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Serv. Comm'n, 354 F.Supp. 778, 783 (D.Conn.1973).

7. Chance v. Board of Examiners, 458 F.2d 1167, 1175 (2d Cir. 1972), aff'g 330 F.Supp. 203, 223 (S.D.N.Y.1971).

8. It is not clear whether the applicants surveyed by the Department had also passed the character review.

on the eligible list,[9] of whom 2,418 were finally qualified, the expert calculated that while 11.5% minorities took the written examination, only 4.5% of those who passed the qualifying medical and physical examinations, as well as the written examination, were minorities. Another way of describing the relative impact of the examination, according to Professor Siegmund, is that 18.4% of whites who took Exam 0159 ranked in the top 4,000 and survived the medical and physical examinations, while the comparable figure for minorities is 6.6%—a ratio of 2.8 to 1. He testified that the disparity reflected by these results was statistically significant to a very high degree; that the differential impact would have occurred by chance less than one time out of 10,000. In sum, he concluded that the entire examination process had a substantial discriminatory impact on the minority groups. Upon the basis of the entire 7,987 candidates called for medical and physical examinations, Professor Siegmund calculated that only 15% of minority examinees as against 34% of white applicants passed these procedures as well as the written examination—a ratio of about 2.3 to 1. He considered the disparity concerning these 7,987 "significant" in the same sense he described the disparity regarding the first 4,000 candidates.

Plaintiffs' statistical analysis of comparative examination performance is corroborated by the overwhelming disparity between minority representation in the Department (5%) and in the general population of New York City within the age group eligible for appointment (32%). Most courts have viewed comparisons of this kind as a factor to be considered where the job opportunity in question does not require specialized educational training, but is one open to the general public as is that of fireman.[10] At the least, this extreme incongruity[11] may be considered confirmatory of plaintiffs' statistical showing.

■ Plaintiffs' statistical calculations, which defendants do not challenge in themselves, establish a prima facie case of de facto racial discrimination. In Chance v. Board of Examiners[12] the overall white passing rate was approximately 1.5 times that of minorities; whites passed the two most important examinations at rates of 2 and 1⅓ times that of minorities.[13] Consequently, if the raw data upon which Professor Siegmund's analysis was based is accepted, the even greater disparity in the instant case readily meets the standard of a

9. The witness concentrated his analysis on this first 4,000, since he was informed that those ranking below have only a marginal chance of ultimate appointment.

10. See, e. g., Carter v. Gallagher, 452 F.2d 315, adopted in relevant part, 452 F.2d 327 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Serv. Comm'n, 354 F.Supp. 778, 786 (D.Conn.1973); Fowler v. Schwarzwalder, 351 F.Supp. 721 (D.Minn.1972); Western Addition Community Organization v. Alioto, 340 F.Supp. 1351, 1352 (N.D.Cal.1972); cf. Chance v. Board of Examiners, 330 F.Supp. 203, 214 (S. D.N.Y.1971), aff'd, 458 F.2d 1167 (2d Cir. 1972). Some courts have regarded substantial disparities of this nature as sufficient in themselves to establish a prima facie case of racial discrimination. See Fowler; Pennsylvania v. Sebastian, No. 72–987 (W.D.Pa., Dec. 4, 1972); Western Addition; Penn v. Stumpf, 308 F.Supp. 1238 (N.D.Cal.1970).

11. Of course this disparity was a result of prior entrance examinations rather than of Exam 0159 itself. In light of testimony concerning the many similarities between Exam 0159 and prior entrance examinations, however, the disparity is nevertheless of probative value. It should also be noted that plaintiffs' reliance upon 1970 census figures regarding the percentage of minorities in the age bracket eligible for appointment may be slightly misleading because applicants are permitted to reside in six suburban counties as well as the City. But this cannot even begin to account for the fact that minorities comprise only 5% of the Department.

12. 458 F.2d 1167 (2d Cir. 1972).

13. Id. at 1171.

"significant and substantial" discriminatory impact adopted by the Court of Appeals in *Chance,* thereby requiring the defendants to establish that the examination was "job related," discussed hereafter.[14]

The defendants seek to overcome the force of plaintiffs' statistical analysis and their contention that it reveals "a disparity of sufficient magnitude to amount to a *prima facie* case of invidious *de facto* discrimination"[15] by challenging the accuracy and sufficiency of the raw data relied upon by plaintiffs. The thrust of their attack is directed at the methods employed to gather the relevant data and certain alleged gaps in the information compiled. Before reviewing defendants' objections, however, it should be noted that where public employment practices are under challenge defendants usually have superior access to relevant statistical data than plaintiffs and that the latter will often be dependent upon the efforts and good faith of the former. In addition, statistical evidence by its very nature deals with probabilities rather than certainties. All that can be required of methods employed in gathering such evidence is that they assure reasonably accurate findings. Absolute perfection usually is not attainable in this kind of endeavor.[16] The right of racial minorities to demand that the state justify even de facto discrimination may not be so restricted that it exists in principle but not in fact.

Defendants first attack the accuracy of the head count made by members of the Vulcan Society of the ethnicity of those who took the written examination. The counting procedures employed were sufficient to guarantee reasonably accurate results.[17] On the morning of the examination members of the Vulcan Society stationed themselves outside the entrance to each examination site long before the start of the examination and counted on clickers the number of blacks and Hispanics who entered. The candidates entered at a pace that permitted accurate counting of each black and Hispanic, and in cases of doubt whether an individual belonged to a minority group the counters, pursuant to instruction, did not include him in the count. The counters, who were blacks, considering their background and experience, could in the vast majority of cases readily identify a black or Hispanic, and there is no reason to reject the substance of the results. Indeed, the defendants, other than to argue that the head count was not accurate, have offered no evidence to impugn its basic integrity.

Surprisingly, the second challenge is directed toward the sight ethnic survey made by the Department itself of the 4,462 candidates who appeared for and passed the physical and medical examinations. Without advancing any reason, they blandly assert that they place no reliance upon the accuracy of its results. This survey was furnished by defendants to plaintiffs in response to an interrogatory and it must be presumed to be substantially correct; otherwise one questions why it was made—surely not for self-deception or to mislead interest-

14. Research has failed to reveal any decision which has held that disparities of the magnitude present in the instant action are insufficient to make out a prima facie case, while several courts have predicated findings of de facto racial discrimination on roughly similar statistical patterns. *See* Castro v. Beecher, 459 F.2d 725 (1st Cir. 1972); Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Serv. Comm'n, 354 F. Supp. 778 (D.Conn.1973); Pennsylvania v. O'Neill, 348 F.Supp. 1084 (E.D.Pa. 1972), aff'd in relevant part by an equally divided court, 473 F.2d 1029 (3d Cir.

1973); Western Addition Community Organization v. Alioto, 340 F.Supp. 1351 (N.D.Cal.1972).

15. Chance v. Board of Examiners, 458 F. 2d 1167, 1176 (2d Cir. 1972).

16. *Cf.* Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1088–1090 (E.D.Pa.1972), aff'd in relevant part by an equally divided court, 473 F.2d 1029 (3d Cir. 1973).

17. It would take a miscount of very substantial proportions to dissipate plaintiffs' prima facie showing.

ed parties or the Court. Even accepting defendants' contention that there are close cases in which it is difficult to determine an individual's ethnicity, such instances are minimal and do not substantially affect plaintiffs' prima facie showing of a discriminatory impact.[18]

The defendants next challenge the validity of plaintiffs' statistical analysis because it was based upon a single examination—0159, and contend that this is insufficient to be meaningful. They point to several cases, including *Chance,* where plaintiffs predicated their statistical showings upon more than one examination. This attack is without substance. The consequence of relying upon one examination is only that any finding of discrimination and the relief to be granted will necessarily be restricted to the scope of the proof. The evidence presented was more than adequate to support a finding of discriminatory impact. While the fifty examinations in *Chance* given over a seven-year period involved approximately 6,000 applicants, Exam 0159 was taken by 14,168 candidates and plaintiffs' statistical analysis was based upon the top 7,987 on the eligible list—certainly a sufficient number to yield meaningful information. As already noted, Professor Siegmund's analysis revealed that the disparity between minority and white test performance was significant.

A closely related point urged by the defendants is that the statistical analysis should have been based upon the entire 12,049 who took the examination rather than the top 7,987 on the eligible list. However, defendants' expert acknowl-

edged that the significant measure of a candidate's performance on Exam 0159 is his rank on the eligible list and not whether he passed or failed. Realistically, the prospect of any candidate ranking below 7,987 ever being appointed is remote. Defendants plan to appoint only 628 men from the list through April 1974, and this in a period following a prolonged job freeze.[19] Plaintiffs were justified in not extending their analysis beyond the first 7,987 rankings. The Department itself established this as the break-off point of those it called for physical and medical examination, at which time it made its ethnic count. That the candidates below 7,987 have not been called for the physical and medical examinations strongly suggests that they have slight if any chance of appointment.

Defendants' final methodological objection focuses on the fact that instead of introducing data concerning the ethnicity of those who passed the written examination, plaintiffs rely upon statistics based on those who passed the subsequent physical and medical examinations as well. The contention is that the evidence presented does not foreclose the hypothesis that it was the medical and physical examinations rather than the written examination which accounted for the discriminatory impact. Even assuming that plaintiffs were required to establish that the written portion of the examination by itself had a substantial discriminatory impact upon minorities, the evidence establishes the overwhelming likelihood that such was the case. Professor Siegmund, based upon

18. The only other conceivable method of obtaining the relevant data would have been for defendants to have required all applicants to state their ethnicity. Not only is it questionable whether all candidates would be disposed to accurately provide such information, but it is also doubtful whether defendants were prepared to cope with the political difficulties such a requirement might generate. Indeed, the defendant Department of Personnel refused the request of the Columbia University Urban Center, which was retained to evaluate a training program designed

to prepare minorities to take Exam 0159 jointly sponsored by the Fire Department and the U. S. Department of Labor, to require those who took Exam 0159 to state their ethnicity for the purpose of obtaining data needed to determine the success of the project. *See* report of the Research Unit of Columbia University Urban Center on the New York City Fire Department Tutorial Project 62–66.

19. It is significant to note that of the 629 top ranking finally qualified candidates, only 3.2% are minorities.

the hypothesis that in fact the written examination *did not* discriminate against minorities, calculated that whites must have applied for and passed the medical and physical examinations at a rate 2.7 times that of minorities. He was of the view, and this Court agrees, that it is unreasonable to assume that whites would perform so much better than minorities on the pass-fail physical and medical components. While Professor Siegmund acknowledged that he could not determine with precision the relative impact of the written, the physical and the medical examinations, nonetheless he concluded that a significant portion of the discriminatory impact came from the written examination. Defendants have neither presented any testimony nor advanced any reasons which would support a contrary view. Moreover, the examination may not be truncated; whether or not it has an adverse discriminatory impact upon minority groups should be considered in terms of the total examination procedure. Here there can be no doubt, whatever the relative impact of component parts, that in end result there was a significant and substantial discriminatory impact upon minorities attributable in considerable part to the written examination.

■■ The further argument is made that even if plaintiffs' statistical evidence is adequate, they have nevertheless failed to meet their burden of proof because of their inability to eliminate the possibility that the adverse impact of the examination on minorities is explicable in terms of the educational and cultural deprivations of minority groups. There is no merit to this contention. It is no defense that defendants acted in good faith and without any intent to discriminate or that the discriminatory impact of the examination procedure may be due to socio-economic disadvantages suffered by minority groups. The very essence of the concept of de facto discrimination stated in *Chance* is that when state action which is neutral on its face unintentionally disadvantages racial minorities in areas such as public employment, the state has the burden of demonstrating that the action in question has at least a substantial relation to a legitimate state interest such as hiring qualified employees. Inquiries into ultimate causes are irrelevant. The law views de facto racial classifications, whatever their ultimate sociological explanation, as sufficiently suspect to place upon the state a heavy burden of justification.[20] We now turn to the question of whether defendants have discharged that burden.

### JOB-RELATEDNESS

■■ Plaintiffs having established a statistical disparity of sufficient magnitude to make out a prima facie case, the defendants bear "a heavy burden of justifying [their] contested examinations by at least demonstrating that they were job-related."[21] A job-related examination is one that accurately tests the capacity of the applicant to do the job for which he is applying, or is "reasonably constructed to measure what it purports to measure."[22] Although this notion is a simple one, the task of determining whether an examination is in fact job-related involves issues and problems which are outside the experience of most laymen. Consequently, courts confronted with litigation of this kind have placed considerable reliance upon generally accepted principles of psychological testing which have been developed for the purpose of assuring that employment and other aptitude tests measure

20. *See* Castro v. Beecher, 459 F.2d 725, 730–731 (1st Cir. 1972) ; Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Serv. Comm'n, 354 F.Supp. 778, 785–786 (D.Conn.1973).

21. Chance v. Board of Examiners, 458 F. 2d 1167, 1176 (2d Cir. 1972). The Court of Appeals found it unnecessary, as does this Court, to reach the "most difficult question" of whether defendants are required to satisfy the stringent compelling state interest equal protection standard in cases of this type. *Id.* at 1177.

22. *Id.* at 1174.

what they purport to measure.[23] Indeed, insistence upon the use of generally accepted professional standards of employment test validation would appear to be precisely the correct response to a prima facie showing of discriminatory impact upon racial minorities; for if an examination which disadvantages racial minorities does in fact conform to professional standards of job-relatedness, that provides at least some assurance that the white majority has not placed a burden upon racial minorities which it would have been unwilling to place upon others.

The experts of the parties agree that there are several generally accepted methods of establishing the job-relatedness or "validity" of employment examinations. The preferred method of test validation is criterion-related or empirical validity, which includes what are referred to as the predictive and concurrent methods of validation. Predictive validation consists of a comparison between the examination scores and the subsequent job performance of those applicants who are hired. If there is a sufficient correlation between test scores and job performance, the examination is considered to be a valid or job-related one. Concurrent validation requires the administration of the examination to a group of current employees and a comparison between their relative scores and relative performance on the job. Experts called by both sides agreed that this method is less desirable than predictive validation because of the possibility that some distortion may result from either the experience or lack of motivation of the current employees who participate in the examination for experimental purposes. Nevertheless concurrent validation has its uses, because in the absence of an examination which has been used and predictively validated in the past, it is the only method of empirically determining whether an examination adequately assesses what it is intended to assess prior to its administration to actual job applicants.

Defendants concede that no attempt was ever made to predictively or concurrently validate Exam 0159 or any previous Department entrance examination. There is a serious question as to whether the failure of defendants to even attempt to determine if an empirical correlation existed between test and job performance through either the predictive or concurrent methods of validation is in itself fatal to their attempt to justify Exam 0159. *Chance* explicitly left open the question of whether "the State is required to establish predictive validity as well as content validity for its job testing procedures."[24] Some courts have

---

23. In particular, they have looked to the Guidelines on employment testing promulgated by the Equal Employment Opportunity Commission, 29 C.F.R. § 1607, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Title VII originally only prohibited racial discrimination by private employers, but it was amended in 1972 to cover state and city employees. In Griggs v. Duke Power Co., 401 U.S. 424, 433–434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court held that the Guidelines were entitled to "great deference" in Title VII litigation. Since the instant action does not invoke Title VII and in any event the administrative remedies thereunder have not been exhausted as required, it is not directly governed by the EEOC Guidelines. Nevertheless courts confronted with challenges to public employment examinations predicated upon the equal protection clause of the Fourteenth Amendment have generally agreed that the Guidelines issued by the EEOC provide persuasive standards for evaluating claims of job-relatedness. *See, e. g.,* Castro v. Beecher, 459 F.2d 725, 729 (1st Cir. 1972) ; Carter v. Gallagher, 452 F.2d 315, 320, 326, adopted in relevant part, 452 F.2d 327 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L. Ed.2d 338 (1972) ; Fowler v. Schwarzwalder, 351 F.Supp. 721 (D.Minn.1972) ; Pennsylvania v. O'Neill, 348 F.Supp. 1084 (E.D.Pa.1972), aff'd in relevant part by an equally divided court, 473 F.2d 1029 (3d Cir. 1973) (en banc) ; Western Addition Community Organization v. Alioto, 340 F.Supp. 1351 (N.D.Cal.1972) ; *cf.* Chance v. Board of Examiners, 458 F.2d 1167, 1176–1177 (2d Cir. 1972).

24. 458 F.2d at 1177 n. 16.

taken the position that predictive or concurrent validation of employment examinations is absolutely required, at least in the absence of a showing that studies employing these methods have been attempted and found impractical to implement.[25] The strong preference for these types of validation is based upon the fact that empirical comparison between test and job performance is the only means of conclusively establishing that an examination actually accomplishes its goal.

Defendants, however, seek to justify their failure to empirically validate the examination by either method upon the grounds that it was neither feasible nor practical to do so, particularly because of the truncation of sample problem (the diminution of the sample which results from the fact that applicants who failed or scored relatively poorly on the examination will never be appointed) and security considerations which make it impractical to administer a civil service examination more than once. It is unnecessary to evaluate the validity of these objections in view of the Court's disposition of the defendants' claim that in any event Exam 0159 was job-related on the basis of content validity.

Content validation is less preferable than the criterion-related methods of test validation but nevertheless a professionally accepted means of establishing job-relatedness where the more desirable empirical methods are impractical.[26] An examination has content validity if the content of the examination matches the content of the job. For a test to be content valid, the aptitudes and skills required for successful examination performance must be those aptitudes and skills required for successful job performance.[27] It is essential that the examination test these attributes both in proportion to their relative importance on the job and at the level of difficulty demanded by the job.[28]

There is no dispute between the parties that a thorough knowledge of the job to be tested is necessary in order to construct a content valid examination. Without this knowledge it is impossible to determine whether the content of the examination is sufficiently related to the content of the job to justify its use. The means used to acquire this information is known professionally as a job analysis—really the beginning point. A job analysis is a thorough survey of the relative importance of the various skills involved in the job in question and the degree of competency required in regard to each skill. It is conducted by interviewing workers, supervisors and administrators; consulting training manuals; and closely observing the actual performance of the job. Although defendants' expert, Mr. McCann, testified that a complete job analysis is not required prior to the construction of an examination where the examiner has "job knowledge" acquired from previous job analyses, he agreed with Professor Edward Opton, plaintiffs' expert, that normally

25. See Fowler v. Schwarzwalder, 351 F. Supp. 721, 725–726 (D.Minn.1972); Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1090–1091 (E.D.Pa.1972), aff'd in relevant part by an equally divided court, 473 F.2d 1029 (3d Cir. 1973) (en banc). The EEOC Guidelines state in relevant part that "empirical evidence in support of a test's validity must be based on studies employing generally accepted procedures for determining criterion-related validity . . .. Evidence of content . . . validity . . . may also be appropriate where criterion-related validity is not feasible." 29 C.F.R. § 1607.5(a).

26. See EEOC Guidelines, 29 C.F.R. § 1607.5(a).

27. See Chance v. Board of Examiners, 330 F.Supp. 203, 216 (S.D.N.Y.1971), aff'd, 458 F.2d 1167, 1174 (2d Cir. 1972).

28. The difference between content validation and the criterion-related methods of validation can best be described as the difference between determining that the content of an examination is logically related to the content of a job and being able to conclude empirically that the examination in question does in fact accurately predict job performance.

the preferable professional procedure is to conduct a job analysis in the course of the preparation of the examination.

Plaintiffs contend, with substantial support in the record, that defendants failed to perform an adequate job analysis in preparing Exam 0159 and that this failure defeats their claim of content validity. The only witness who testified concerning the construction of Exam 0159 was Edward Scheinkman, not a Fire Department official, but Assistant Chief of the Division of the Department of Personnel charged with responsibility for its preparation. Mr. Scheinkman began preparing the examination by gathering together the file on the previous examination, the former notice of examination, the class specifications (a very cursory description of the job contained in the notice of examination) and a magazine published by the Department. He contacted Chief Hartnett, who was then in charge of the Training Division of the Department, to inquire as to the Department's view of the areas of knowledge which should be included in the examination. Hartnett suggested that the subjects covered in the last test should be covered again, with the addition of a section on City government and current events. Somewhat significantly, Fire Commissioner Lowery, with his years of experience as a fire fighter and as an administrator, was not consulted as to the content of the written examination. Scheinkman testified that he never performed any job analyses, did not know of any which were used in the preparation of Exam 0159 and that none were made while he was in the division which prepared examinations for the job of fireman. Indeed, defendants concede that no attempt was ever made to validate the contents of Exam 0159 or any previous Department entrance examination.

The record compels the conclusion that the procedures employed by defendants to construct Exam 0159 did not measure up to professionally accepted standards concerning content validity.[29] The Equal Employment Opportunity Commission Guidelines require that claims of content validity be supported by information derived from job analyses.[30] It should be self-evident that content validity greatly depends upon the adequacy of the manner in which the examination is prepared. Consequently, some courts have taken the view that a careful job analysis is essential to the development of a content valid examination.[31] Even if defendants were not required to conform precisely to all the requirements of a professional job analysis, it is clear that the methods actually employed were below those found unsatisfactory in *Chance*, where defendants made a much more extensive inquiry into the nature of the job in question.[32] Indeed, the most which Mr. McCann was willing to state was that it was "possible" to prepare a job-related

29. Mr. Scheinkman's confusion as to precisely what Exam 0159 was designed to evaluate also gives cause for concern. He testified that the purpose of the examination was to measure those areas of knowledge which a person needs in order to enter the probationary firemen training school. This raises serious difficulties, however, because even proof that the examination is valid as to performance at the training school would be of little relevance without a further demonstration that performance at the training school is a valid test of performance on the actual job. *Cf.* Bridgeport Guardians, Inc. v. Members of the Bridgeport Civil Serv. Comm'n, 354 F.Supp. 778, 791 (D.Conn. 1973); Pennsylvania v. O'Neill, 348 F. Supp. 1084, 1090 (E.D.Pa.1972), aff'd in relevant part by an equally divided court, 473 F.2d 1029 (3d Cir. 1973) (en banc). Defendants' position, unlike Mr. Scheinkman's, is that the purpose of Exam 0159 was to assess applicant's ability not only to learn, but also to subsequently perform the duties of firemen.

30. 29 C.F.R. § 1607.5(a). *See* note 23 *supra.*

31. *See* Fowler v. Schwarzwalder, 351 F. Supp. 721, 725–726 (D.Minn.1972); Western Addition Community Organization v. Alioto, 340 F.Supp. 1351, 1355–1356 (N.D.Cal.1972).

32. 330 F.Supp. at 218–220.

examination by the means Mr. Scheinkman described. Defendants' burden, however, is not to establish possibilities but to demonstrate strong probabilities.[33]

Defendants contend that regardless of the inadequacies of the means which they employed to construct Exam 0159 and their failure to ever attempt to validate its contents, these deficiencies are excusable if the final product is in fact a content valid or job-related examination. Even if this contention is accepted, under these circumstances only the most convincing testimony as to job-relatedness could succeed in discharging their burden. The testimony of defendants' expert, however, not only failed to meet this burden but even acknowledged the presence of a major flaw in the examination which is in itself fatal.

Although Mr. McCann stated that in his opinion 80% of the examination was job-related, a view vigorously controverted by plaintiffs' expert, he freely admitted that he would not have included the final twenty questions dealing with New York City government and current events because he was not convinced that they were sufficiently job-related to justify inclusion. A perusal of these twenty questions strongly confirms McCann's reservations. Several required knowledge of recent events in City government which even reasonably well informed New Yorkers might not have possessed. Others demanded familiarity with specific facts concerning the structure of the City's government. One question involved an inquiry about a then current Supreme Court decision on an issue of school desegregation, which it is doubtful could readily have been answered by some lawyers. Chief Hartnett's reason for suggesting the addition of a current events section in Exam 0159 was, according to Mr. Scheinkman, that he felt it was important for firemen to have a general awareness of what is going on in the City. But no attempt was ever made to determine whether this view was a sound one,[34] to professionally devise questions which would test for this awareness of even to evaluate whether the questions actually developed had any relation to their purported purpose. The twenty questions have little apparent relationship to the job of fireman. There cannot be any doubt that the inclusion of these twenty questions (20% of the examination) substantially affected many candidates. Scores on the eligible list were so tightly bunched that missing five questions could reduce an applicant's ranking by more than a thousand places. This was an examination in which two or three correct answers could literally make the difference between being appointed and not being appointed for a great number of applicants.

Defendants also failed to satisfy their burden concerning another aspect of Exam 0159. Plaintiffs contend that the job of fireman is to a large degree a physical one and therefore that a prerequisite to a job-related examination was a competitive physical component. One hardly needs an expert to be aware of the importance of physical capacity in performing the duties of a fireman. It is perhaps best attested to by the fact that from 1919 up to 1968, the physical examination was graded competitively. Additionally, Fire Commissioner Lowery and Fire Chief O'Hagan, each with many years service in the Department and perhaps the best qualified to have a judgment, testified that it would be advantageous to include a competitive physical component to be weighed with the competitive written examination because the nature of the fireman's job makes it desirable to employ the best possible physical specimens. Commissioner Lowery would weigh the competitive physical examination *equally* with the written examination, whereas the Fire Chief would give it 25–30% weight. Indeed, the Commissioner had requested, following its elimination from the 1968

33. *Cf.* Castro v. Beecher, 459 F.2d 725, 732 (1st Cir. 1972).

34. Mr. Scheinkman followed Chief Hartnett's suggestion because he "had no reason to dispute him."

examination, that it be restored in Exam 0159. His request was not complied with by the Department of Personnel because of its view that a graded physical examination might mean delay in the compilation of the eligible list, hardly a plausible explanation.

As against the judgment of seasoned fire fighters, the defendants rely upon the totally unpersuasive testimony of their expert who was without practical experience in the field and who admitted that he had not sufficient time to perform a thorough job analysis. Finally, the defendants have offered no adequate explanation why the practice over almost fifty years of grading the physical examination component was suddenly discontinued in the 1968 examination. In the absence of such an explanation one may draw his own inference. A graded physical examination might well have had a significantly favorable impact upon the relative performance of minorities, since there is no basis upon which to find they would not have scored as well as whites on tests of physical ability.

In view of the unprofessional manner in which the written examination was prepared, the inclusion of a section on current events and City government which constitutes 20% of the examination without any showing of its relation to the job of fireman and the refusal to include a competitive physical examination component despite the request of the Commissioner or to provide a satisfactory explanation for its elimination, defendants have failed to sustain their burden of demonstrating job-relatedness; indeed, the evidence strongly indicates that Exam 0159 was not sufficiently related to the job of fireman to justify its use. This Court is of the opinion, with due respect to the experts, that two items by themselves are sufficient to satisfy a lay person that the examination is subject to condemnation— these are (1) the inclusion of questions on current events and City government, constituting 20% of the written examination; and (2) the elimination of the competitive rating based on the physical examination. Accordingly, upon the entire case, the Court finds plaintiffs have sustained their burden of proof that Exam 0159 is constitutionally invalid because of its invidious discriminatory impact upon blacks and Hispanics.

This disposition makes it unnecessary to consider the other grounds urged by plaintiffs in support of their claim, particularly since little evidence was adduced with respect thereto upon the hearing. The submissions as to these matters were included in post trial briefs or affidavits and in some instances raise issues of fact, the resolution of which would require reopening of the trial.[35]

### THE REMEDY

The final question to be resolved concerns the nature of the appropriate relief. Since the Court has found that the examination violates the plaintiffs' constitutional right to equal protection of the laws, from a strict juridical viewpoint it should be declared void for all purposes. However, some courts have been of the opinion that the preferable course is not to invalidate entirely the results of discriminatory employment examinations, but rather to devise means designed to provide a preference to minority applicants to compensate for their discriminatory impact.[36] No doubt

---

35. There is also serious question as to whether any of the plaintiffs have standing to challenge the educational requirement and prior conviction bar. The complaint alleges that all the individual plaintiffs have either graduated from high school or received equivalency diplomas, and there is no allegation that any plaintiff has ever been convicted of petty larceny or a felony. *Cf.* Castro v. Beecher, 334 F.Supp. 930, 937 (D.Mass. 1971), aff'd in relevant part, 459 F.2d 725 (1st Cir. 1972).

36. *See* Castro v. Beecher, 459 F.2d 725, 736–737 (1st Cir. 1972); Carter v. Gallagher, 452 F.2d 327 (8th Cir. 1971) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972).

there are exigent circumstances in which compensatory adjustments are appropriate and even necessary to remedy constitutional violations.[37] However, there are considerations which suggest that the courts should be hesitant about imposing them. Adjustments based upon racial classification, however well-intentioned, contain within themselves the seed of further divisiveness regardless of their benevolent purpose. Attempts to make fair adjustments may be counterproductive and tend to generate resentments which serve to exacerbate rather than to diminish racial attitudes.[38] Those on an eligible list who have high rankings, with the prospect of imminent appointment, may not understand why they should be bypassed in favor of minority applicants with lower rankings. This court is of the view that an examination list which is constitutionally impermissible should be stricken down in its entirety and the authorities directed to conduct a new examination, free from constitutional taint—that the remedy is not to continue to base appointments on the condemned list but to require executive or administrative officials to live up to their responsibilities and to prepare and conduct an examination consonant with the Fourteenth Amendment. Only in this way can those authorities and the public understand the courts' insistence upon the sanctity of that Amendment. However, defendants have requested this Court (and plaintiffs do not demur), in the event it finds plaintiffs have sustained their claim, as they have, to stay its holding in striking down the eligible list upon equitable grounds. It is urged that the needs of the public justify resort to the existing list in view of the fire fighting personnel shortage; that to freeze all appointments may present a hazardous situation to the citizens of the community. There appears to be substance to this claim. Moreover, it is contended that the preparation of a new examination and the establishment of a new eligible list may take a substantial period, perhaps several years. Accordingly, Exam 0159 is declared unconstitutional and the defendants are enjoined from making any further appointments based upon its results, without prejudice, however, to any application by the parties, upon a showing of compelling necessity, for interim relief which would permit appointments from the eligible list upon an equitable basis pending the prompt promulgation and administration of a new examination free from constitutional taint. There appears to be authority for such exercise of the Court's equity powers, even though the examination itself is declared void.[39]

Settle order on notice.

37. *Cf.* Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).

38. *Cf.* Kaplan, Equal Justice in an Unequal World: Equality for the Negro—the Problem of Special Treatment, 61 Nw.U.L.Rev. 363, 375–380 (1966);

O'Neil, Preferential Admissions: Equalizing the Access of Minority Groups to Higher Education, 80 Yale L.J. 699, 709–711 (1971).

39. *Cf.* Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973).