Edward L. **KIRKLAND** and Nathaniel Hayes, each Individually and on behalf of all others similarly situated, Plaintiffs,

v.

The **NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES** et al., Defendants.

No. 73 Civ. 1548.

United States District Court,
S. D. New York.

April 1, 1974.

See also D.C., 358 F.Supp 1349.

Jack Greenberg, Jeffry A. Mintz, Morris J. Baller, Deborah M. Greenberg, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, New York City, for defendants; Judith A. Gordon, Asst. Atty. Gen., Stanley L. Kantor, Deputy Asst. Atty. Gen., of counsel.

## OPINION

LASKER, District Judge.

This suit is another in an ever-extending series of challenges to civil service examinations. Plaintiffs, who are Correction Officers,[1] provisionally appointed to the rank of Correction Sergeant (Male), contend that the test for promotion and permanent appointment to that position discriminated against them on the basis of race. They seek to represent all Black and Hispanic Correction Officers and provisional Correction Sergeants who failed the examination, who passed it but ranked too low to be appointed or who were deterred by the appointment system from seeking promotion. Defendants are the New York State Department of Correctional Services, its Commissioner, and the New York State Civil Service Commission and its Commissioners.

■ The action is brought under the Fifth and Fourteenth Amendments to the Constitution and under the Civil Rights Act (42 U.S.C. §§ 1981 and 1983) and its jurisdictional counterpart (28 U.S.C. §§ 1343(3) and (4)). Plaintiffs make no claim under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e to 2000e–17), despite the availability, by recent amendment, of remedies under it against states and municipalities (*id.* at § 2000e(a)).[2]

1. Originally, there was a third named plaintiff, the Brotherhood of New York State Correction Officers, Inc. However, this plaintiff withdrew at the commencement of the trial.

2. Defendants urge us to apply the doctrine of primary jurisdiction and defer the case to the Equal Employment Opportunity Commission on the theory that by extending Title VII to cover states and municipalities Congress intended to oblige persons seeking redress against governmental discrimination in employment to resort in the first instance to the EEOC. This contention has been resoundingly rejected in cases involving suits against private employers under 42 U.S.C. § 1981. Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979, 996–997 (1973); Brady v. Bristol-Meyers, Inc., 459 F.2d 621, 623–624 (8th Cir. 1972); Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir.), cert. denied, 404 U.S. 998, 92 S.Ct. 560, 30 L.Ed.2d 551 (1971); Young v. International Telephone & Telegraph Co., 438 F.2d 757, 763 (3rd Cir. 1971); Sanders v. Dobbs House, Inc., 431 F.2d 1097, 1100–1101 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971). Furthermore, cases in this Circuit involving suits which, like the instant case, were brought under § 1983 hold that the amendment to Title VII was not intended to foreclose recourse to the earlier Civil Rights Act. Vulcan Society v. Civil Service Commission, 490 F.2d 387, at 390, n. 1 (2d Cir., 1973); Bridgeport Guardians, Inc., v. Bridgeport Civil Service Commission, 482 F.2d 1333, 1334, n. 1 (2d Cir. 1973).

In spring, 1972, the 1970 eligible list for Sergeant appointments was exhausted. To fill needed positions pending establishment of a new list, the Department of Corrections appointed provisional Correction Sergeants, in August, 1972, to hold their posts until permanent appointments could be made. Both named plaintiffs were appointed at that time.

Upon request of the Department of Corrections, the Civil Service Commission prepared a promotional examination which was administered on October 14, 1972. That examination, 34–944, was taken and failed by plaintiffs and is the subject of this action.

34–944 was taken by 1,383 persons,[3] including 1,264 whites, 103 Blacks and 16 Hispanics. The candidates examinations were graded and the passing grade was established at 70%. After adjustment for veteran's preference and seniority, those who passed were ranked by grade and an eligible list was promulgated on March 15, 1973. On April 10, 1973, this suit was filed and a temporary restraining order entered preventing defendants from making appointments from the list and from terminating the provisional appointments of plaintiffs or members of the class. By modification and stipulation, the restraining order was extended to maintain the status quo until a decision on the merits.

■ The ground rules for cases such as this have been thoroughly elucidated by recent decisions of the Court of Appeals for this Circuit. We note in particular Vulcan Society of the New York City Fire Department, Inc. v. Civil Service Commission ("*Vulcan*"), 490 F.2d 387 (2d Cir. 1973), aff'g, 360 F. Supp. 1265 (S.D.N.Y.1973); Bridgeport Guardians, Inc. v. Bridgeport Civ-

il Service Commission ("*Guardians*"), 482 F.2d 1333 (2d Cir.), aff'g in part and rev'g in part, 354 F.Supp. 778 (D. Conn.1973), and Chance v. Board of Examiners ("*Chance*"), 458 F.2d 1167 (2d Cir. 1972), aff'g, 330 F.Supp. 203 (S.D. N.Y.1971). To summarize the approach adopted by the cases, plaintiffs must first establish a prima facie case showing that the examination has had "a racially disproportionate impact." *Vulcan*, 490 F.2d at 391; Castro v. Beecher ("*Castro*"), 459 F.2d 725, 732 (1st Cir. 1972). If they succeed, it then becomes defendants' burden to justify the examination's use despite its differential impact by proving that it is job-related (*Vulcan*, 490 F.2d at 391) and that any disparity of performance results solely from variance in qualification and not from race (Griggs v. Duke Power Co., 401 U.S. 424, 430–431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Chance*, 330 F. Supp. at 214). Discharging this burden would entitle defendants to judgment; failure would, of course, require the court to take the third step of determining what remedy would be appropriate.

■■ As is typical in cases of this type, plaintiffs do not allege that defendants have intentionally discriminated against their class. Such an allegation is not a necessary part of their case. *Chance*, 458 F.2d at 1175–1176. As the Supreme Court stated in *Griggs*:[4]

> "[G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." 401 U.S. at 432, 91 S.Ct. at 854.

However, the fact that the alleged discrimination is not claimed to be deliber-

---

3. The total candidate pool was approximately 1,441. However, for reasons not apparent from the record, the computer display provided by defendants to describe candidate performance (PX–12) indicates the performance of only 1,383 candidates. Since both parties have based their calculations on that figure, we will do likewise.

4. *Griggs* arose under Title VII of the Civil Rights Act of 1964; however, the same approach to employment discrimination cases has generally been followed in § 1983 cases as in Title VII cases. *Vulcan*, 490 F.2d at 394, n. 9; *Castro*, 459 F.2d at 733.

ate modifies the burden placed on the state to justify its actions. Intentional racial discrimination would require the state to demonstrate a compelling necessity for its selection methods. *Cf.* Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). However, "the Supreme Court has yet to apply that stringent test to a case such as this, in which the allegedly unconstitutional action unintentionally resulted in discriminatory effects." *Chance,* 458 F.2d at 1177. Agonizing over whether the state can discharge its constitutional obligations merely by suggesting a rational basis for the examination's use or whether it must satisfy a more demanding standard, short of the compelling interest test, is unnecessary. The guidelines have been so refined by the cases that no ambiguity obscures the road to determination regardless of the difficulties of classification which may remain to plague the theorists. *Guardians,* 482 F.2d at 1337. The decisions impose on the state "a heavy burden of justifying its contested examinations by at least demonstrating that they were job-related." *Chance,* 458 F.2d at 1176; *see also Guardians,* 482 F.2d at 1337. This "heavy burden" is discharged if the state "come[s] forward with convincing facts establishing a fit between the qualification and the job." *Vulcan,* 490 F.2d at 393, quoting *Castro,* 459 F.2d at 732. Once the state proves its case to that extent, it need not establish, as would be required under the compelling interest approach, that no alternate means of selection are open to it. *Castro,* 459 F. 2d at 733; *see also Vulcan,* 490 F.2d at 393.

However clearly the issues are delineated by well-established precedent, nothing can make easy the task of deciding a case such as this. The competing interests are vital to the named parties, to other individuals who may be affected by the outcome and to the public at large. Plaintiffs strive to insure for themselves and the minorities they seek to represent the fair treatment in the public employment sphere which the Constitution guarantees. Their efforts bring them into conflict with those individuals who passed the challenged examination and have a vested interest in securing the promotions which are rightfully theirs if the examination is upheld. For both groups, the outcome is critical since it affects their ability to earn a living by advancing in the profession of their choice. [ Last and perhaps most important is the public's stake in establishing and maintaining a system of prison administration which is both competent and representative of the population. As members of the public, we include, of course, the inmates of the prison system who, more than anyone else in the community, are directly affected by the quality of correctional supervision. The delicacy of the decision is further compounded by the potential for heightened tension which attends any direct conflict along racial and cultural lines.]

Bearing these factors in mind, we proceed, with caution but without more ado, to a consideration of plaintiffs' prima facie case.

## I. DISPROPORTIONATE IMPACT.

Plaintiffs rest their case on the following uncontested statistics. The figures computed by defendants indicate that White candidates passed 34–944 at a rate of 30.9%, while only 7.7% of Black candidates and 12.5% of Hispanic candidates achieved a passing score. (Transcript at 500). That is, Whites passed at a rate approximately four times that of Blacks and 2.5 times that of Hispanics. Defendants concede the statistical significance of these differences. (Post-trial Memorandum at I–4.)

Plaintiffs' evidence reveals an even more startling disparity among those who ranked high enough to be appointed. The Department of Corrrections intends to appoint a maximum of 147 per-

sons from the present eligible list.[5] A computer display of the results of 34–944 (PX–12) reveals that, of 159 persons who scored 57 or above (a group large enough to satisfy the Department's projected needs), 157 were White, two were Black and none was Hispanic. Thus, 12.5% of the Whites who took 34–944 are likely to be appointed, while only 1.9% of Black candidates and no Hispanics have a chance at appointment. These results would lead to the appointment of Whites at 6.5 times the rate of Blacks and would bar completely the appointment of Hispanics.

The statistical significance of these figures is established beyond dispute by the earlier cases. In *Chance, Guardians* and *Vulcan*, the impact was less drastically disproportionate among the races. In *Chance*, the passing rate for Whites was 1.5 times that of Blacks and Hispanics (330 F.Supp. at 210); in *Guardians*, Whites passed at 3.5 times the rate for Blacks and Hispanics (354 F.Supp. at 784); and in *Vulcan*, Whites scored high enough to have a chance at appointment at 2.8 times the rate for Blacks and Hispanics (360 F.Supp. at 1269).

Defendants do not challenge the accuracy of plaintiffs' figures (for which they are the source) nor do they deny the statistical significance of the differential impact indicated by them. They contend, however, that the approach taken by plaintiffs, that is, consideration of the statistics as to the statewide impact of the entire exam, does not accurately reflect the performance of the groups in relation to each other. They urge us, rather, to base our determination of racial impact on the candidates' performances facility by facility rather than throughout the state. They contend that otherwise it is impossible to determine whether minority candidates are succeeding less well as a group because of their racial and cultural backgrounds or because they are located at facilities which, for reasons unspecified, prepare their officers less well for the promotional exam. In fact, the great majority of minority candidates are located at Ossining (82 Blacks out of a total of 104, 9 Hispanics out of a total of 16) with the second largest concentration of Blacks at Greenhaven (8). (PX–12, codes 1007 and 1008.) Defendants argue that if both Whites and minority candidates at Ossining perform less well than persons —White, Black or Hispanic—employed at other facilities, then 34–944 has not been shown to differentiate on the basis of race. Second, defendants contend that, since 34–944 is composed of five subtests, comparative performance on each subtest should be determinative rather than performance on the test as a whole. If these approaches are adopted, they claim, the three groups of candidates will be shown not to have performed sufficiently differently to make out a prima facie case of disproportionate impact.

To support their argument that the results of 34–944 are relevant only if separated by facility, defendants rely on an analysis of the computer display of examination results (PX–12) drawn up by Kenneth Siegel, the Associate Personnel Examiner who was responsible for the preparation of 34–944. He analyzed the performances of the groups in terms of mean scores on the total exam and on each of the five subtests at Ossining, Green Haven, all the other facilities and all the facilities taken together (DX–DD). The reason for selecting Ossining and Green Haven for special attention was the concentration of minority candidates at those facilities. Sie-

5. The Department of Corrections appointed 87 persons from the eligible list based on 34–944 in April, 1973. (PX–2, answer to Interrogatory No. 39.) On May 29, 1973, the Department indicated that it intends to make another 40–60 appointments from the list within roughly two years from that date. (PX–2, answer to Interrogatory No. 40.) Thus, a maximum of 147 persons will be appointed through May of 1975. No appointments are likely after that date, since another promotional exam will be given in 1974 (PX–42, p. 4., 7th par.) and the eligible list from 34–944 will therefore expire in 1974 or early 1975.

gel's written analysis (DX–DD) does not indicate passing rates, but only mean scores. However, Siegel testified that the difference in passing rates between Whites and Blacks at Green Haven (Transcript at 511) and all other facilities except Ossining is not statistically significant (Transcript at 509, 515). Based on Siegel's testimony, defendants argue that as a result plaintiffs' prima facie case fails with respect to all facilities except Ossining.

The principal obstacle to accepting defendants' analysis is that it is premised on assumptions which are factually erroneous. Their own statistics bely their theory. Siegel's analysis (DX–DD) of the computer display (PX–12) reveals not only that the mean score for Whites state-wide (48.9) is superior to that of Blacks (43.2) and Hispanics (44.2), but also that the mean scores at Ossining, Green Haven and other facilities considered separately reflect the same pattern. Whites at Ossining achieved a mean score of 47.32, compared with 42.96 for Blacks and 41.56 for Hispanics. The disparity at Ossining is virtually identical to that derived from a comparison of statewide figures for Whites and Blacks (48.9 to 43.2) and is greater than the state-wide difference between Whites and Hispanics (48.9 to 44.2). This effectively refutes defendants' theory that minority candidates generally performed less well than Whites solely because they were concentrated at Ossining where candidates as a whole did less well. The range at Green Haven is almost as striking and indicates again a greater variance than is found state-wide between Whites and Blacks and an almost identical disparity as that found state-wide between Whites and Hispanics: Whites, 48.68; Blacks 42.00; Hispanics, 44.00. A comparison of results at facilities other than Ossining and Green Haven bears out the trend: Whites, 49.00; Blacks, 45.21; Hispanics, 48.17. It is true that Hispanics at these facilities fared better than at Ossining and Green Haven and their scores more closely approximate the

performance of Whites. However, the importance of this discovery is somewhat discounted by the small size of the sample (6 Hispanic candidates) which decreases the possibility of statistical accuracy (Transcript at 936–37). Furthermore, Siegel's analysis indicates that the standard deviation in mean scores between Whites and Blacks was statistically significant at Ossining, Green Haven and all other facilities as well as state-wide, and the same is true of Whites and Hispanics at Ossining where the largest concentration of Hispanics is found. (DX–DD.)

An analysis of passing rates, which is more appropriate since it is the passing score which determines a candidate's eligibility for appointment, is even more illuminating. Siegel testified that there was a significant difference between the passing rates of Whites and Blacks at Ossining (Transcript at 509), but that no such difference existed between Whites and Blacks at Green Haven and facilities other than Ossining and Green Haven and none between Whites and Hispanics at Ossining, or other facilities. (Transcript at 509–515.) He did not compare the passing rates of Whites and Hispanics at Green Haven because there was only one Hispanic candidate at that facility. (Transcript at 511.) Nor did he testify as to the difference between the passing rates of Whites and Hispanics at facilities other than Ossining and Green Haven. Siegel is correct that the disparity in passing rates between Whites and Blacks at Ossining is significant: Whites passed at a rate of 23.5% and Blacks at a rate of 4.9%. (PX–33.) However, his testimony as to Blacks at Green Haven and at other facilities and as to Hispanics at Ossining flies in the face of the figures in evidence. To the contrary, comparison of the groupings mentioned above indicates in each instance a significant disparity between the passing rate of White and minority candidates. Whites at Green Haven passed at a rate of 31.6%, while Blacks and Hispanics achieved rates of only 12.-

3% and 0%[6] respectively. 30.7% of Whites at facilities other than Ossining and Green Haven[7] passed 34–944, while only 14.3% of Blacks passed. Although Hispanics at facilities other than Ossining and Green Haven passed at a higher rate than Whites (33.3% compared to 30.7%), the reliability of this computation is put in doubt by the smallness of the sample. Hispanics at Ossining, on the other hand, passed at a rate of 0% compared to a White passing rate of 23.-5%. Accordingly, contrary to Siegel's conclusion, the disparity between White and minority candidates was significant with regard to Blacks at Ossining, Green Haven and all other facilities, as well as state-wide, and was significant with regard to Hispanics at Ossining, where the largest number of Hispanics are located.

■ These computations destroy the factual premise of defendants' argument that minority performance reflects the facilities in which they concentrated rather than their minority characteristics. We would in any event be forced to reject defendants' theory as a matter of law, even if it could be factually substantiated. Attempts to correlate racial performance to such non-racial characteristics as quality of schooling or educational and cultural deprivation have been rejected as irrelevant to rebut a statistical prima facie case. As the district court opinion in *Guardians* stated:

"More fundamentally, this data [as to quality of schooling] fails to remove the *prima facie* showing of discrimination because it does not alter but only tries to explain the difference in passing rates." 354 F.Supp. at 785; *see also Vulcan*, 360 F.Supp. at 1272. *Cf. Castro, supra.*

The controlling decisions clearly posit that, in order to shift to defendants the burden of showing that performance on the examination correlates to performance on the job, plaintiffs are required to do no more than demonstrate that minority candidates as a whole fared significantly less well than White candidates, regardless of possible explanations for their poorer performance. To quote *Guardians* once more:

"The point is that a discriminatory test result cannot be rebutted by showing that other factors led to the racial or ethnic classification. The classification itself is sufficient to require some adequate justification for the test." *Id.*, 354 F.Supp. at 786.

Finally, we fail to understand the relevance of defendants' attack on plaintiffs' prima facie case. Defendants appear to concede that, at the very least, Blacks at Ossining who failed 34–944 have established their right to challenge its job relatedness. (Post-trial Memorandum at I–11.) This group constitutes two-thirds of the proposed plaintiff class (77 out of 117 Blacks and Hispanics combined), but if even a far smaller number had succeeded in proving disportionate impact detrimental to themselves, defendants would be obliged, as they themselves concede, to prove job relatedness.

■ We turn to defendants' second challenge to plaintiffs' case. Siegel's analysis of the computer display indicates that although there is a statistical-

---

6. Inasmuch as there was only one Hispanic candidate from Green Haven, the importance of this comparison should not be exaggerated.

7. The figures for White, Black and Hispanic passing rates at facilities other than Ossining and Green Haven are not in the record, but can be readily computed from those which are in evidence (see PX–33). The number of Whites at "other facilities" is 1069 (1264, the total of White candidates, minus 195, which is the sum of White candi-

dates at Ossining, 81, and Green Haven, 114). The number of Whites at "other facilities" who passed is 328 (383 minus 55, the sum of 19 at Ossining and 36 at Green Haven). Accordingly, the passing rate is 30.7%. Blacks at "other facilities" number 14 (103 minus 89, which is 81 at Ossining and 8 at Green Haven). Two Blacks at "other facilities" passed (7 minus 5). As a result, the passing rate is 14.3%. There were six Hispanics at "other facilities" (16 minus 10, nine at Ossining, one at Green Haven). Two passed and the rate is 33.3%.

ly significant difference in the total mean scores of Whites and Blacks and Whites and Hispanics state-wide and at Ossining, and, as to Blacks, at Green Haven and facilities other than Ossining and Green Haven, not every subtest indicates such a disparity. (DX–DD.) It is unnecessary to detail the permutations sub-test by sub-test and facility by facility, since the suggested approach itself is invalid as a matter of law. The cases indicate that a showing that the overall examination procedure produced disparate results cannot be rebutted by fragmenting the process and demonstrating that separately the parts did not differentiate along racial or cultural lines. In *Chance,* for example, the fact that minority candidates had a higher passing rate than White candidates on seven out of fifty examinations did not vitiate plaintiffs' proof that the series of examinations as a whole discriminated against them and their class. 330 F.Supp. at 211; *see also Guardians,* 354 F.Supp. at 786. In *Vulcan,* the very question whether a single examination procedure can properly be subdivided and the parts considered separately, was raised and Judge Weinfeld rejected the proposition:

> "Moreover, the examination may not be truncated; whether or not it has an adverse discriminatory impact upon minority groups should be considered in terms of the total examination procedure. Here there can be no doubt, whatever the relative impact of component parts, that in end result there was a significant and substantial discriminatory impact upon minorities. . . ." 360 F.Supp. at 1272.

Any other approach conflicts with the dictates of common sense. Achieving at least a passing score on the examination in its entirety determines eligibility for appointment, regardless of performance on individual sub-tests. Accordingly, plaintiffs' case stands or falls on comparative passing rates alone. Thus, in law and in logic, we find defendants' approach unwarranted.

■ Rejection of defendants' dual attack on plaintiffs' showing of differential impact leaves no doubt that plaintiffs' prima facie case has been amply established. Accordingly, the burden of proof swings to defendants to demonstrate that 34–944 is job-related. We turn to a consideration of that question.

## II. JOB-RELATEDNESS.

■ "Validation" is the term of art designating the process of determining the job-relatedness of a selection procedure. Cases and official guidelines recognize three validation methods: criterion-related validation, construct validation and content validation. *See, e. g., Vulcan,* 490 F.2d at 394–396; *Guardians,* 482 F.2d at 1337–1338 and 354 F. Supp. at 788–789; Equal Employment Opportunity Commission Testing and Selecting Employees Guidelines ("EEOC Guidelines"), 29 C.F.R. § 1607, at § 1607.5(a); American Psychological Association Standards for Educational & Psychological Tests and Manuals ("APA Standards") (PX–26) at 12–13.

### A. Criterion—Related Validation.

■ Decisions in this Circuit and the EEOC guidelines agree that criterion-related or empirical validation is preferable to other validation methods. *Guardians,* 482 F.2d at 1337 and 354 F.Supp. at 788; *Vulcan,* 360 F.Supp. at 1273; EEOC Guidelines at § 1607.5(a). In *Vulcan,* Judge Weinfeld defined the two methods which are subsumed under the criterion-related rubric:

> "Predictive validation consists of a comparison between the examination scores and the subsequent job performance of those applicants who are hired. If there is a sufficient correlation between test scores and job performance, the examination is considered to be a valid or job-related one. Concurrent validation requires the administration of the examination to a group of current employees and a comparison between their relative scores and relative performance on the job." 360 F.Supp. at 1273.

The methodology which unites the two types of criterion-related validity requires two fundamental steps:

"Criteria must be identified which indicate successful job performance. Test scores are then matched with job performance ratings for the selected criteria." *Guardians*, 482 F.2d at 1337.

The EEOC's minimum standards for validation (EEOC Guidelines at § 1607.-5) require an employer to undertake criterion validation if it is feasible. They demand "empirical evidence in support of a test's validity . . . based on studies employing generally accepted procedures for determining criterion-related validity, such as those described in [APA Standards]". *Id.* at subdiv. (a). They state further that "[e]vidence of content or construct validity, as defined in that publication, may also be appropriate where criterion-related validity is not feasible." *Id.*

■ Because this case was not brought under Title VII and no resort has been made to the EEOC as would be required under the 1964 Act, the Commission Guidelines are not binding and cannot finally resolve the issue whether criterion-related validation is required. However, the Guidelines are recognized as relevant and useful as a "helpful summary of professional testing standards" (*Vulcan*, 490 F.2d at 394, n. 8) and as "persuasive standards for evaluating claims of job-relatedness" (*Vulcan*, 360 F.Supp. at 1273, n. 23).[8]

Notwithstanding the Guidelines' mandate of criterion-related validation and despite suggestions in some cases that only that method suffices to carry the burden of proof as to job-relatedness (*Vulcan*, 360 F.Supp. at 1273; *Guardians*, 354 F.Supp. at 789), no case in this Circuit has gone so far as to hold that failure to test an exam by criterion validation or to demonstrate the nonfeasibility of that approach justifies setting the exam aside even if it has been content validated. Those cases which have indicated a preference for criterion-related validation have also found a lack of content and construct validation before striking down an examination. Furthermore, the Court of Appeals for this Circuit has recently abjured an absolutist approach, stating that "failure to use [criterion-related validation] is not fatal." *Vulcan*, 490 F.2d at 395.

■ Defendants specifically admit that 34–944 has not been validated by the criterion-related approach. (Transcript at 389; PX–2, answer to interrogatory 26.) However, in view of Judge Friendly's unambiguous statement in *Vulcan* that criterion-related validation is not required if the examination can be validated by other means, we turn our attention to the other validation methods.

*B. Construct Validation.*

■ The second recognized method of validation is "construct validation." As defined by Judge Friendly in *Vulcan*, this method "requires identification of general mental and psychological traits believed necessary to successful performance of the job in question. The qualifying examination must then be fashioned to test for the presence of these general traits."[9] *Vulcan*, 490 F.2d at

---

8. *See also* Carter v. Gallagher, 452 F.2d 315, 320, 326 (8th Cir. 1971), adopted in relevant part, 452 F.2d 327 (8th Cir.) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972); Fowler v. Schwarzwalder, 351 F.Supp. 721, 724 (D.Minn. 1972); Pennsylvania v. O'Neill, 348 F.Supp. 1084, 1103 (E.D.Pa.1972), aff'd in relevant part by an equally divided court, 473 F.2d 1029 (3d Cir. 1973) (en banc); Western Addition Community Organization v. Alioto, 340 F.Supp. 1351 (N.D.Cal.1972).

9. The common example which is given to highlight the different characteristics of the content and construct validation methods involves an examination for the position of typist. A content valid test would require the applicant to type. In such an instance the content of the job and of the exam is identical. A construct valid approach would identify certain traits essential to success as a typist, such as ability to concentrate, perseverance and attention to detail, and would examine the applicant for those traits. *Vulcan*, 490 F.2d at 395.

395. We mention this method only for the sake of completeness; none of the parties has introduced evidence that its use would be appropriate here or that its requirements have been fulfilled.

### C. Content Validation.

We reach finally the dispositive issue in the case: Have defendants demonstrated that 34–944 is a content valid examination?

■ Initially, it is essential to determine precisely what proof is necessary to satisfy the requirements of content validity. Judge Weinfeld's definition in *Vulcan* reflects the principles established by case law and professional publications:

> "An examination has content validity if the content of the examination matches the content of the job. For a test to be content valid, the aptitudes and skills required for successful examination performance must be those aptitudes and skills required for successful job performance. It is essential that the examination test these attributes both in proportion to their relative importance on the job and at the level of difficulty demanded by the job." 360 F.Supp. at 1274 (footnotes omitted). *See also, Vulcan,* 490 F.2d at 395; *Guardians,* 482 F.2d at 1338.

Accordingly, defendants must demonstrate not only that the knowledge, skills and abilities tested for by 34–944 coincide with some of the knowledge, skills and abilities required successfully to perform on the job, but also that 1) the attributes selected for examination are critical and not merely peripherally related to successful job performance; 2) the various portions of the examination are accurately weighted to reflect the relative importance to the job of the attributes for which they test; and 3) the level of difficulty of the exam matches the level of difficulty for the job. In sum, to survive plaintiffs' challenge, 34–944 must be shown to examine all or substantially all the critical attributes of the sergeant position in proportion to their relative importance to the job and at the level of difficulty which the job demands.

■ The problem which confronts the trier of fact when charged with applying these principles to a given situation is that normally, and it is the case here, he is expert neither in psychometrics nor in the field in which the examination is given. Nevertheless, he is required to make factual determinations 1) whether the examination meets professionally acceptable standards of technical adequacy and 2) whether it has content validity for the job in question. (*See* EEOC Guidelines, 29 C.F.R. at § 1607.5(a).) [10] To overcome the obstacle presented by lack of expertise, the cases have developed an approach which minimizes the obvious dangers inherent in judicial determination of content validity for a job about which the judge has, at best, only superficial knowledge. Judge Friendly described with approval the approach taken by Judge Weinfeld in *Vulcan* as follows:

> "Instead of burying himself in a question-by-question analysis of Exam 0159 to determine if the test had construct or content validity, the judge noted that it was critical to each of the validation schemes that the examination be carefully prepared with a keen awareness of the need to design questions to test for particular traits or abilities that had been determined to be relevant to the job. As we read his opinion, the judge developed a sort of sliding scale for evaluating the examination, wherein the poorer the quality of the test preparation, the greater must be the showing that the examination was properly job-related, and *vice versa.* This was the point he made in saying that a showing of poor preparation of an examination entails the need of 'the most convincing testi-

---

10. The EEOC Guidelines state: "Evidence of content validity alone may be acceptable for well-developed tests that consist of suitable samples of the essential knowledge, skills or behaviors composing the job in question." 29 C.F.R. at § 1607.5(a).

mony as to job-relatedness.' The judge's approach makes excellent sense to us. If an examination has been badly prepared, the chance that it will turn out to be job-related is small. *Per contra,* careful preparation gives ground for an inference, rebuttable to be sure, that success has been achieved. A principle of this sort is useful in lessening the burden of judicial examination-reading and the risk that a court will fall into error in umpiring a battle of experts who speak a language it does not fully understand. See *Chance, supra,* 458 F.2d at 1173." 490 F.2d at 395–396.

The primary emphasis, therefore, is on the validity of the methods used in creating the examination not on the independent validity of the end product.

■ Preparation of a content valid examination requires cooperation between subject matter experts who provide content input and psychometric experts who construct an examination using that input. It goes without saying that the competence of the people involved in the process determines the quality of the product. The cooperative effort of these two groups includes several stages: 1) Analysis of the job to isolate the essential knowledge, skills and abilities required by it; 2) determination of the scope of the examination, the method or methods of testing to be employed and the weight to be given different portions of the examination process; 3) formulation of individual items; and 4) establishment of the passing point.

The cornerstone in the construction of a content valid examination is the job analysis. Without such an analysis to single out the critical knowledge, skills and abilities required by the job, their importance relative to each other, and the level of proficiency demanded as to each attribute, a test constructor is aiming in the dark and can only hope to achieve job relatedness by blind luck. As Judge Weinfeld stated in *Vulcan:*

"There is no dispute between the parties that a thorough knowledge of the job to be tested is necessary in order to construct a content valid examination. Without this knowledge it is impossible to determine whether the content of the examination is sufficiently related to the content of the job to justify its use. The means used to acquire this information is known professionally as a job analysis —really the beginning point. A job analysis is a thorough survey of the relative importance of the various skills involved in the job in question and the degree of competency required in regard to each skill." 360 F.Supp. at 1274.

The persons charged with the responsibility for 34–944, Siegel and Samuel Taylor, testified that, although an adequate job analysis was performed, it does not exist in documentary form. (Transcript at 362–63, 682–83.) Defendants contend, however, that the existence of such an analysis is demonstrated by various documents which are in evidence, namely, a job audit (DX–E), KS & A [11] statements (PX–8), class specifications (PX–4) and the rule book (DX–O). (Transcript at 362.) They argue further that the term "job analysis" means "a series of operations or understandings, discussions by which you identify what people do and why and what can be tested and what should be tested" (Transcript at 362–63) and as such is a "process [that] cannot really be reduced to something called a job description" (Transcript at 363; see also Transcript at 683). Accordingly, defendants rely on the knowledge of the job, either pre-existing or obtained during the course of the preparation of 34–944, possessed by those who participated in the examination's construction.

The difficulties presented by defendants' approach are manifold. Accepting their argument that a job analysis need

11. "KS&A" is the standard abbreviation for "knowledge, skills and abilities."

not be reduced to writing, it is nonetheless not persuasive that an adequate job analysis existed at some point in the minds of defendants' experts, if, at the present time, they are unable to prove its existence. In fact, the existence of such an analysis has not been proven. The documents relating to the subject which are in evidence do not even approximate a professionally adequate job analysis; the test constructors' knowledge which was not committed to writing is in some instances unproven and in others unimpressive; and the reliance of the test constructors upon various aspects of the purported job analysis is largely unestablished. The logical, and indeed inevitable inference is that no adequate job analysis was performed.

Since the existence of a job analysis is of primary importance in reaching a decision as to job-relatedness, we will comment on defendants' proof on the subject at some length.

 ██ Although Samuel Taylor, Chief Personnel Examiner, testified that, in his opinion, the job audit, KS & A statements, class specifications and the employee rule book together constituted a satisfactory job description "that would be an adequate basis for developing the examination" (Transcript at 362), these documents do not satisfy the requirements of a thorough job analysis as they have been developed by the cases. The job audit (DX–E) has such major flaws that it is almost irrelevant to the case; it was prepared for a purpose other than exam preparation, it was outdated at the time the exam was prepared, and it was devoted almost entirely to describing the position of Correction Officer, not Correction Sergeant. The audit was conducted in order to determine whether various jobs in the Correction Officer Series should be upgraded for the Civil Service classifica-

tion purpose of determining whether compensation for the positions should be increased. (Transcript at 353; PX–7.)[12] While a document prepared independently of the examination process is not *per se* disqualified for consideration in preparing a job analysis, it cannot substitute for an analysis having the specific goal of examination preparation in mind. Furthermore, the job audit was conducted in Spring, 1970 (Transcript at 360), while 34–944 was administered in October, 1972. Siegel, who was responsible for 34–944, testified that the Sergeant job changed within the two years prior to the examination dated. (Transcript at 533, *see also* PX–42, p. 4.) The audit, almost in its entirety, describes the Correction Officer job. Such references as there are to the Sergeant position do not approach the type of depth of analysis which is essential to the preparation of a job-related test. The audit does not indicate the relative importance of the skills and tasks involved in the Sergeant job or the competency required for the various aspects of the position, both of which are essential functions of a job analysis. Finally, the persons who prepared the audit did not participate in the preparation of the exam, nor is their competence to conduct the audit in any way established by the record. It is perhaps not surprising, in view of the limited utility of the audit—and this is perhaps the most critical point to make on the subject—that it was not consulted by the test constructors in formulating specific exam items. (Transcript at 667–68.)

The other documents on which defendants rely fare no better as substitutes for a job analysis. The class specification (PX–4) is a one paragraph description of the position which contains no more information than would be pos-

<hr />

12. That the goal of the audit is not coextensive and may even be inconsistent with that of a proper job analysis is demonstrated by the fact that, although the audit concluded that the Sergeant position should be reclassified to grade 17 (Transcript at 564; PX–

4), the supervision subtest called for questions appropriate to grades 10–14 and the report preparation sub-test questions were geared to an entry level investigative position (PX–8).

sessed by anyone with only a cursory knowledge of the job. It is a useless document for the intended purposes.

The same observation can be made about the KS & A statements (PX–8), which are descriptions of the five examination subtests rather than of the knowledge, skills and abilities demanded by the sergeant job. The "definition of KS & A" which appears for each subtest is a brief paragraph which states, as starkly as possible, the knowledge, skill or ability tested for, without any indication of gradations of complexity, context, methods or anything which would indicate how the knowledge, skill or ability operates in the actualities of the job. In his deposition (a portion of which was read into the record), Siegel stated that "[t]he K, S and A statements are used as guidelines, in effect, in preparation of particular items or of items in general on—in that they represent the —the K, S and A statements represent those relevant portions of the position, let's say, which we wish to test and therefore act as a guide in telling us the types of items to write or select." (Transcript at 665.) This description of the use to which these documents were put is not credible, because the statements simply do not provide sufficient particularity to aid in the construction of specific items or even of clusters of items. They are only guidelines in the most general sense of blocking out the scope of the exam. Accordingly, it is not surprising that, as Siegel admitted, items on the exam were prepared before the KS & A statements. (Transcript at 666.) As a result, the statements are irrelevant to the job analysis, both because they are so lacking in detail as to serve no useful purpose and because they were not relied on. These phenomena are readily explainable by the fact that the KS & A statements were, in fact, the end product of the job analysis "process" rather than a component part of it, or a summary rather than a guideline. As Samuel Taylor stated, in terms which squarely contradict Siegel: "They [the test con-

structors] didn't rely on it [PX–8], because it didn't exist before they went through their process." (Transcript at 348.)

Finally, the rule book (DX–0) is obviously not a job analysis or a part of a job analysis. The rules themselves are, concededly, important to the job, but what is important to the analysis is how the rules are applied and what depth of knowledge is required, neither of which is indicated by the rule book.

Defendants' reliance on the knowledge of the sergeant job either possessed by the test constructors prior to commencing work on 34–944 or acquired by them during the course of their work on it is also inappropriate. The record does not establish that the persons who worked on the exam, three of whom came from the Department of Corrections and three from Civil Service, possessed the kind of intimate knowledge of the job that would enable them to do without a job analysis, or would make them, as Samuel Taylor claimed, "living job descriptions" (Transcript at 362).

Of the three persons from the Department of Corrections, only one, Hylan Sperbeck, testified. His qualification as a subject matter expert consists of long service in the Department. The respect to which years of experience might normally be entitled is greatly undercut in his case by the fact that the type of assignments which Sperbeck has held are not necessarily conducive to enhancement of his understanding of the sergeant position. Sperbeck became a Correction Officer in 1957, a Sergeant in 1968, a Lieutenant in 1972 and a Captain in 1973. (Transcript at 738.) Since March, 1970, he has been assigned to the Training Academy and, since that time, he has spent only five or six weekends and four consecutive days in active line duty at any of the facilities. (Transcript at 764–65.) The result is that Sperbeck has been engaged in a normal supervisory capacity at a facility only for the two year period from 1968 to 1970, during which he was a Ser-

geant. Given the changes which have occurred in the job since that time, his experience, although useful, cannot substitute for a professionally acceptable job analysis. The qualifications as subject matter experts of the two other persons from Corrections (other than years of service) are not established by the record.

Siegel and the two other persons from Civil Service had no first-hand knowledge of the Sergeant position, although Siegel claims some familiarity with the job from past experience in preparing exams in the Correction Officer Series. He also testified to visits to Coxsackie and Matteawan, but the importance of these visits should not be overemphasized since the visit to the latter was for a purpose unrelated to 34–944 (in fact, there are no sergeants at Matteawan (Transcript at 541)), while the visit to the former entailed only an hour or two of discussion with Sergeants (Transcript at 546–47), and, in any event, one day at a facility is hardly sufficient to make someone an expert as to the job. It is worthy of note, moreover, that two of the five subtests (40% of the exam) were prepared solely by Civil Service personnel, other than Siegel, without any input from the subject matter "experts" from Corrections. (Transcript at 367.)

Accordingly, the record does not establish that the knowledge and qualifications possessed by the test constructors were such that they can simply be deemed to have had in their heads a job analysis sufficient to satisfy legal and professional requirements. Indeed, a contrary inference is warranted by the record.

We conclude, therefore, that defendants have failed to prove that they performed an adequate job analysis. The same lack of professionalism which characterized the process by which defend-

ants conducted their job analysis also characterized the manner in which they determined the type of examination, its scope, the weight of the subtests and the passing score. All of these matters seem to have been decided almost as a matter of course by referring to and following the practices established by prior exams.

The record indicates that the promotional examination for the Sergeant position has been for many years a written, multiple choice examination. This was true at least as to the examinations given in 1964, 1968, 1970 and 1972. (PX–43.) [13] When asked how the decision was reached that the knowledge, skills and abilities needed for the position of Correction Sergeant could best be tested by a written examination, Siegel stated in his deposition:

"[I]t's to a large extent, I suppose, a decision of history, let's say, where previously selections for this position have been made by written examination and I would assume that the request that we received from the Department of Correctional Services for this examination also indicated request for a written examination." (Transcript at 697.)'

Somewhat more thought seems to have gone into the decision not to use performance ratings as any part of the promotional process, although such use is permitted by state law (Civil Service Law § 52(2)). (Transcript at 671–72.) Siegel and Taylor stated that they considered using supervisory evaluations, but decided not to because of the inadequacy of the existing rating scale. (Transcript 381–82, 672.)

Like the decision to use a written examination and to exclude consideration of supervisory evaluations, determination of the scope and organization of 34–944 seems to have followed the pattern of earlier examinations. Of course,

---

13. PX–43 describes the scope of prior examinations given in 1964, 1968 and 1972. However, since Siegel testified that an examination was given in 1970 (Transcript at

531–33) and since 34–944 was given in 1972, we assume that 34–007, the last examination to precede 34–944, was in fact given in 1970 and not in 1972.

if these set a model for good construction and job-relatedness, that would be a good argument not to depart from their mold. However, while there is evidence in the record of the discriminatory impact of the earlier tests, there is no evidence as to their job-relatedness. Furthermore, even an exam once job-related may become outdated as jobs change. At the very least, it is fair to say that the slavish imitation of earlier examinations which we find in this case indicates an alarming lack of independent thought about how to assure that 34–944 was job-related.

The scope of 34–944 was identical to that of the 1964, 1968 and 1970 examinations, except that some of the earlier examinations included a section on interpretation of written materials instead of or as well as the section on preparation of written reports found in 34–944. (Transcript at 530–32; PX–43.) The similarity is not accidental; Siegel and Samuel Taylor both testified that they relied heavily on prior scope statements in defining the scope of 34–944. (Transcript at 530–32, 659.)

Furthermore, the organization of 34–944 is virtually identical to that of its predecessors. Both 34–944 and the 1964 exam contain five subtests of 15 items, while the 1968 and 1970 tests consist of 90 items, including four subtests of 15 items and one of 30 items. (PX–43.) When asked why each subtest on 34–944 was weighted equally with 15 items of the same value, Siegel replied: "By using a set number of items in each sub test, we are able to more routinely do certain types of analyses on this material that gives us additional information of how the items are working, and things like that." (Transcript at 566.) That this was a routine decision based solely or primarily on administrative convenience is further evidenced by his statement that "in our department we work on the basis of 15 questions per sub test and we work in constructing a test in sub test units." (Transcript at 700.) This practice, however, is not necessarily compatible with the notion

that different parts of the examination must be weighted as nearly as possible to reflect the relative importance of the attributes tested for to the job as a whole. This lack of individualization in the framing of 34–944 is again demonstrated by the fact that 60% of the items on the Sergeant exam were also found on the Lieutenant exam given at the same time. (Transcript at 534–35.)

Finally, the decision to establish the passing score of 70% subordinates the goal of job-relatedness to that of administrative convenience. Samuel Taylor and Siegel stated that they set the passing score at the maximum permitted by law (Transcript at 524), because that score would still permit a sufficiently large group of passing candidates to satisfy the employment needs of the Department. (Transcript at 380, 524–27.) As a result, Taylor admitted that "its function is really more for the purpose of regulating the number of people who will then be in line to take the job than it is to declare that a man is qualified or not." (Transcript at 341.) Although this approach is not without justifying logic, it departs from the requirement, imposed by law, that such decisions be made so as to further the paramount goal of job-relatedness. Properly employed, the passing score should serve to separate those who are qualified for the job from those who are not. (Transcript at 880–81.) Admittedly, it did not serve that purpose in this case.

The factors described above lead inescapably to the conclusion that the procedures employed in constructing 34–944 do not conform to professionally acceptable and legally required standards. This determination may be enough to justify a finding that the examination is not job-related, without regard to the quality of the examination. *See* Fowler v. Schwarzwalder, 351 F.Supp. 721, 725 (D.Minn.1972); Western Addition Community Organization v. Alioto, 340 F. Supp. 1351, 1355 (N.D.Cal.1972). As Judge Weinfeld stated in *Vulcan*: "It should be self-evident that content va-

lidity greatly depends upon the adequacy of the manner in which the examination is prepared." 360 F.Supp. at 1275. At a minimum, "under these circumstances only the most convincing testimony as to job-relatedness could succeed in discharging [defendants'] burden." *Id.* at 1276.

This burden has not been met. To the contrary, positive evidence of job-relatedness is conspicuous by its absence. Defendants' expert, Dr. Erwin Taylor, specifically refused to testify that 34–944 was job-related. (Transcript at 809–11.) He was not willing to go beyond his statement that "if these procedures were in effect followed, they would constitute the steps necessary but not necessarily sufficient to the development of a series of job related tests." (Transcript at 809.) Plaintiffs' expert, Dr. Richard Barrett, a leading industrial psychologist and expert in the field, while declining to state positively that 34–944 was not job-related, did testify that the exam had not been demonstrated to be job-related (Transcript at 893–94) and indicated that he had "substantial doubts as to whether the test is in fact valid" (Transcript at 894–95).

Taking to heart Judge Friendly's implied caveat against "burying [ourselves] in a question-by-question analysis" of the exam (*Vulcan*, 490 F.2d at 395), we merely note in passing some of the imperfections indicated by the record. Witnesses for both sides agreed that certain items in the laws, rules and regulations subtest involve guidelines that a Sergeant would have no need to apply. (Transcript at 128–30, 132–33, 553, 774.) As to all the subtests, Dr. Barrett testified as to item defects, inconsistencies, and irrelevancies with regard to numerous questions. (Transcript at 903–22.) It is unnecessary to agree with his comments as to each item to find that the record supports his conclusion that 34–944 is not a professionally adequate examination. (Transcript at 922–23.)

More serious perhaps than specific item flaws is the fact that, regardless whether 34–944 adequately tests the attributes it is intended to measure, it fails to examine a number of traits, skills and abilities which witnesses for both sides singled out as important to the Sergeant job. Among these are leadership, understanding of inmate resocialization, ability to empathize with persons from different backgrounds, and ability to cope with crisis situations. (Transcript at 63–64, 117, 308, 702–703.) We conclude, as did Judge Newman in *Guardians*, that:

> "Even if the exam need not be comprehensive as to content or constructs, the evidence does not indicate whether the few areas of knowledge and the few traits measured are the ones that will identify suitable candidates for the job . . . . An exam of this sort, which does not attempt to be comprehensive in testing for content or constructs, employs a sampling approach. Such an exam might, in some circumstances, be shown to meet the standard of job relatedness. But the evidence does not establish the representativeness of the knowledge or traits sampled by the exam used here." 354 F.Supp. at 792.

Given the unwillingness of both experts to state positively that 34–944 is or is not job-related, it would be foolhardy on our part to hazard such an opinion. It is, of course, barely possible that the exam is job-related; "[d]efendants' burden, however, is not to establish possibilities but to demonstrate strong probabilities" (*Vulcan*, 360 F.Supp. at 1276 (footnote omitted)). We can say with certainty, and we are required to do no more, that the probabilities in this case run heavily against defendants. Accordingly, they have failed to meet the burden which the law imposes on them.

III. REMEDY.

We turn, therefore, to the question of relief. Plaintiffs seek 1) a permanent injunction against basing permanent ap-

pointments to the position of Correction Sergeant on the results of 34–944; 2) a mandatory injunction obliging defendants to develop a valid selection process for that position; and 3) an injunction requiring defendants to make interim and regular appointments of class members. They also seek a class action determination and an award of costs, including attorneys' fees.

Taking the class action question first, we find that plaintiffs have demonstrated the existence of a class satisfying the requirements of Rule 23 composed of all Black and Hispanic Correction Officers or provisional Correction Sergeants who failed 34–944 or who passed but ranked too low to be appointed.[14] The class is clearly too numerous to permit joinder: a total of 119 minority candidates, 103 Blacks and 16 Hispanics, took 34–944 and of these only 9 passed and only 2 (both Black) received a score of 57 or above giving them a chance at appointment. Accordingly, the class numbers 117 persons which is more than sufficient to satisfly the demands of Rule 23(a)(1). Korn v. Franchard Corp., 456 F.2d 1206, 1209 (2d Cir. 1972). Whether examination 34–944 discriminated against minority candidates is the question of law common to the class and plaintiffs' claims are perfectly typical of the claims of the class.[15] Rule 23(a)(2) and (3). The representative parties have amply demonstrated their ability to protect fairly and adequately the interests of the class by conducting the litigation to its present successful conclusion. Rule 23(a)(4). Finally, the defendants have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(2). Accordingly, it is proper that the case be treated as a class action.

We turn to the substantive relief requested by plaintiffs. Plaintiffs seek and are entitled to declaratory and injunctive relief against the use of 34–944 and the eligible list which was promulgated pursuant to it as a basis for appointments to the position of Correction Sergeant. Accordingly, examination 34–944 is declared unconstitutional and defendants are enjoined from making appointments based on its results. Furthermore, defendants are enjoined from terminating the provisional appointments of the named plaintiffs and those members of the class who are provisional Correction Sergeants solely because of their inability to pass 34–944.

The invalidation of 34–944 clearly authorizes the court to grant appropriate affirmative relief, including mandating the creation of a new selection process to conform with the requirements of the Fourteenth Amendment and ordering the promotion of members of the plaintiff class in a ratio designed to correct the effect of defendants' unconstitutional employment practices. As the Supreme Court stated in Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965):

"[T]he court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in

---

14. Plaintiffs originally sought to represent as well persons who were deterred from taking the examination by defendants' discriminatory employment practices. Since they introduced no evidence as to persons who might have been deterred, plaintiffs "do not now insist upon their inclusion in the class" (Post Trial Memorandum at 64), and we decline to include them.

15. Defendants claim that the named plaintiffs cannot represent persons who passed the examination but ranked too low to be appointed because both named plaintiffs failed 34–944. However, plaintiffs' interests and those of persons who passed but whose low rank prevents their appointment are identical, and we reject defendants' contention that the claims of the former are not representative of those of the latter.

the future." *See also, Guardians,* 482 F.2d at 1340.

However, we believe it is appropriate to defer decision on the extent of affirmative relief to enable defendants to respond to the specific requests made by plaintiffs. Since, pursuant to court order, the post-trial memoranda in this case were submitted simultaneously, defendants have not as yet had the opportunity to address themselves to the recommendations contained in plaintiffs' brief and proposed order. We refer, in particular, to plaintiffs' suggestions that 1) the new selection procedure be required to conform with the EEOC Guidelines; 2) class members who are presently provisional Correction Sergeants [16] be permanently appointed to that position; 3) an interim permanent appointment procedure be instituted which would provide for the promotion of minority persons in a ratio of at least one to each three White promotions; and 4) this promotion ratio be continued even after a valid selection procedure has been devised. Accordingly, defendants are instructed to submit an answering memorandum on these issues within ten tays of the filing of this Opinion, plaintiffs to have the opportunity to reply within one week thereafter.

Finally, plaintiffs request an award of reasonable attorneys' fees. Defendants oppose on two grounds: 1) As a general rule, successful litigants cannot recover attorneys' fees from the losing party and plaintiffs have not shown themselves to fall into any exception to this rule; and 2) an award of attorneys' fees is barred by the doctrine of sovereign immunity and the Eleventh Amendment.

▇▇▇ Defendants' first argument, while correctly stating the general approach, overlooks a growing line of cases, discussed below, which establishes an exception in favor of plaintiffs who act as private attorneys general and who litigate not only for their own benefit but also to vindicate the rights of others similarly situated and the interest of the public generally:

> "The rule briefly stated is that whenever there is nothing in a statutory scheme which might be interpreted as precluding it, a 'private attorney-general' should be awarded attorneys' fees when he has effectuated a strong Congressional policy which has benefited a large class of people, and where further the necessity and financial burden of private enforcement are such as to make the award essential." La Raza Unida v. Volpe, 57 F.R.D. 94, 98 (N.D.Cal.1972).

In such cases, the protection of rights conferred both by the Constitution and by Congressional enactment requires that the normal rule be superseded. This exception to the general rule of not allowing attorney's fees derives from Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L. Ed.2d 1263 (1968), a class action under Title II of the Civil Rights Act of 1964, in which the Supreme Court stated that "one who succeeds in obtaining an injunction under that Title should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Id.* at 402, 88 S.Ct. at 966; *see also* Mills v. Electric Auto-Lite Co., 396 U.S. 375, 389–397, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

The fact that this suit was not brought under the Civil Rights Act of 1964, which specifically provides for the award of attorneys' fees, but rather under 42 U.S.C. §§ 1981 and 1983, which do not so provide, does not mandate a different result. In Lee v. Southern Home Sites Corp., 444 F.2d 143 (5th Cir. 1971), the Court of Appeals relying on *Piggie Park* held that "attorney's fees are part of the effective remedy a court should fashion to carry out the congressional policy embodied in [42 U.S.C.] Section 1982." *Id.* at 144. Indeed, the

---

**16.** Plaintiffs also request the permanent appointment of Henry Liburd, a member of the class who was not provisionally appointed to the Sergeant position, because they contend that the record establishes his qualifications for permanent appointment.

fact that subsequent Congressional legislation in furtherance of the same objective provided for the award of attorneys' fees was considered by the *Lee* court to be relevant to a determination of appropriate remedies under the earlier Civil Rights Acts, which do not enact a panoply of specific remedies:

"[I]n fashioning an effective remedy for the rights declared by Congress one hundred years ago, courts should look not only to the policy of the enacting Congress but also to the policy embodied in closely related legislation. Courts work interstitially in an area such as this." *Id.* at 146.

We note, in this context, that Title VII of the 1964 Act, which provides a parallel route to the one chosen by plaintiffs here, allows for the award of attorneys' fess. 42 U.S.C. § 2000e–5(k). Furthermore, the absence of specific remedies in the earlier Civil Rights Acts authorizes the court to exercise its broad equitable power to include in the relief any remedy which furthers the vindication of Constitutional and Congressional policy, whereas if the statutes detailed the types of relief which they authorized and omitted attorneys' fees they would bar by inference such an award. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); Harper v. Mayor and City Council, 359 F.Supp. 1187, 1217–1218 (D.Md.1973).

Because the issue is important and novel, at least in this Circuit, we list at greater length than might otherwise be required some of the recent decisions which have granted attorneys' fees in suits under §§ 1981–1983 on the "private attorney general" theory, despite the absence of statutory authorization and without relying on a showing of bad faith or unreasonable obduracy by defendants. See Cooper v. Allen, 467 F.2d

836, 841 (5th Cir. 1972); Knight v. Auciello, 453 F.2d 852 (1st Cir. 1972); Lee v. Southern Homes Sites Corp., 444 F.2d 143, 144–148 (5th Cir. 1971); Harper v. Mayor, 359 F.Supp. 1187, 1217–1218 (D.Md.1973); Wyatt v. Stickney, 344 F.Supp. 387, 408–409 (M.D.Ala.1972); Sims v. Amos, 340 F.Supp. 691, 694–695 (M.D.Ala.) (three judge court), aff'd, 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972); NAACP v. Allen, 340 F. Supp. 703, 708–710 (M.D.Ala.1972); Bradley v. School Board, 53 F.R.D. 28, 41–42 (E.D.Va.1971); Morrow v. Crisler, 4 E.P.D. ¶ 7584 (S.D.Miss.1971). *See also* Brewer v. School Board, 456 F. 2d 943, 951–952 (4th Cir. 1972); La Raza Unida v. Volpe, 57 F.R.D. 94, 98–102 (N.D.Cal.1972). We note particularly that Cooper v. Allen, Harper v. Mayor, NAACP v. Allen and Morrow v. Crisler are cases which, like the suit here, were brought under 42 U.S.C. §§ 1981 and 1983 to vindicate the right to equal employment opportunities in the public sphere. We see no relevant distinction between them and the case at hand.

■■ Defendants' second contention, that the award of attorneys' fees is barred by the Eleventh Amendment and the doctrine of sovereign immunity,[17] has been rejected in the recent case Gates v. Collier, 489 F.2d 298 (5th Cir., 1973). The court there affirmed an award of attorneys' fees, stating:

"This Court has said that in such a suit as this the award of attorney's fees is not an award of damages against the State, even. though funds for payment of the costs may come from the state appropriations.

\* \* \* \* \* \*

"Although the trial court had the power to assess attorney's fees and expenses against the individual defendants found to have engaged in the

---

17. No Eleventh Amendment or sovereign immunity problems would arise from an award of attorneys' fees against the individual defendants. Although the record might well justify such an award, it is nonetheless not within our power since the individual defend-

ants were never properly brought before the court. Kirkland v. New York State Department of Correctional Services, 358 F.Supp. 1349, 1350, n. 1. (S.D.N.Y.1973). Accordingly, attorneys' fees can only be awarded against the two defendant state agencies.

unconstitutional conduct, we think it does not vitiate the award because the trial court prescribed that this part of the costs were to be payable 'from funds which the Mississippi Legislature, at its 1973 Session, may appropriate for the operation of the Mississippi State Penitentiary,' and were not to be 'the personal, or individual, liability of the varied defendants or any of them.' " Id. at 302 (footnote omitted).

The issue has also arisen and been resolved adversely to defendants' position here in Sims v. Amos, 340 F.Supp. 691 (M.D.Ala.) (three judge court), aff'd, 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972), and La Raza Unida v. Volpe, 57 F.R.D. 94, 101, n. 11 (N.D.Cal.1972).

 Plaintiffs ask the court to determine at this time the size of the award and have submitted affidavits upon which to base the determination. To accede to their request without providing defendants the opportunity of bringing to our attention facts relevant to determining the amount in question would be improper in view of the recent decision of the Court of Appeals for this Circuit in City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir., 1974). Accordingly, defendants are instructed to include in the memorandum discussed above any facts which they wish the court to bear in mind in determining the amount of attorneys' fees to which plaintiffs are entitled.

To sum up: Examination 34–944 is declared unconstitutional and is set aside. Defendants are enjoined from making permanent appointments to the position of Correction Sergeant from the eligible list which is based on its results and from terminating the provisional appointments to that position of plaintiff class members solely because of their failure to pass the examination. Defendants are instructed to submit a memorandum on the subjects delineated above within ten days of the filing of this Opinion, plaintiffs to reply within one week thereafter. Plaintiffs are

awarded reasonable costs, including attorneys' fees, in an amount to be determined after further documentation by the parties.

It is so ordered.